UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

HERMAN GREINSTEIN, Individually and
For Others Similarly Situated,

       Plaintiff,

v.

GRANITE SERVICES INTERNATIONAL,
INC. and FIELDCORE SERVICES
SOLUTIONS, LLC,

       Defendants.

Case No. 2:18-cv-00208-Z-BR

**DEFENDANTS' RESPONSE TO ORDER TO SHOW CAUSE**

On August 13, 2020, Defendants filed an Emergency Motion to Cease Improper Notice and Solicitations and to Enforce Agreement (the "Motion"). On August 25, 2020, this Court ordered Defendants' counsel to "show cause for mislabeling the Motion as an 'emergency' when they waited months before seeking relief, and failing to timely confer with opposing counsel before filing the Motion." (Dkt. 111 at 1.) Defendants' counsel respectfully responds to the Court's Order, addressing each topic—the labeling of the Motion and timeliness of conferral—in turn, and commits to comply strictly with the letter and spirit of the Court's Rules regarding motion practice.

**I.**     **Basis for Emergency**

In requesting emergency relief when they did, Defendants sincerely believed that Plaintiff's counsel's unauthorized distribution of notice to unrepresented individuals, running in tandem with a request for Court-authorized notice, presented an exigent situation necessitating urgent review. Defendants' belief was informed by case law and undersigned counsel's personal experience. That belief was further shaped by the fact that in the days and weeks after learning of Plaintiff's counsel's first advertisement, Defendants learned of multiple additional advertisements.

In the context of a putative FLSA collective action, a request for conditional certification triggers "a district court's discretionary authority to oversee and facilitate the notice process." *Halle v. W. Penn Allegheny Health Sys. Inc.*, 842 F.3d 215, 224 (3d Cir. 2016); *see also Greinstein v. Granite Servs. Int'l, Inc.*, 2019 WL 6330631, at *2 (N.D. Tex. Aug. 27, 2019), *rpt. and rec. adopted*, 2019 WL 6330123 (N.D. Tex. Nov. 26, 2019) ("Whether courts issue notice is entirely within their discretion."). The Supreme Court has recognized "the wisdom and necessity for early judicial intervention in the management of litigation." *Hoffmann-La Roche Inc. v. Sperling*, 493 U.S. 165, 171 (1989). Such intervention occurs at the conditional certification stage. *See id.* Here, Plaintiff's counsel's unauthorized distribution of advertisements concerning claims in this case to individuals whom they do not represent, *at the same time* they have asked the Court to supervise and authorize notice, created, in Defendants' view, an urgent problem that warranted more immediate attention than Plaintiff's simultaneous request for formal notice.

It is the undersigned's sincerely held belief that distributing notice while simultaneously requesting Court authorization to send notice of a pending FLSA action is wrong. And not just wrong, but fundamentally misleading and damaging, as the parallel process has the potential of (1) requiring Defendants and this Court to expend time and resources on a motion to facilitate notice while Plaintiff simultaneously takes steps that could render notice needless, and (2) falsely conveying the Court's imprimatur on Plaintiff's counsel's unilateral social media campaign. It is within this Court's sole discretion to manage how and when notice will be provided, if at all. It is Defendants' view—as well as the undersigned's sincerely held belief—that Plaintiff should not be permitted to undermine that discretion by distributing notice via his online advertisements.

Parties have sought, and other courts have granted, similar emergency motions under analogous circumstances, including in cases in which Defendants' counsel participated. For

example, in *Maddox v. Knowledge Learning Corp.*, before the court approved any form of notice, the defendant filed an "emergency motion for a cease and desist order" regarding plaintiffs' website. 499 F. Supp. 2d 1338, 1340-41 (N.D. Ga. 2007). The court quickly ordered "plaintiffs to temporarily remove the website pending an accelerated period of briefing on the issue." *Id.*

In *Aiuto v. Publix Super Markets, Inc.*, decided days after this Court determined the instant Motion, the defendant discovered that plaintiffs had posted notice of the FLSA litigation on the internet without the court's authorization.[1] No. 1:19-cv-04803, Order (Dkt. 79), slip op. at 2 (N.D. Ga. Aug. 28, 2020). The defendant filed an emergency motion to stop the unauthorized notice. The plaintiffs responded by arguing, among other things, that the defendant had waited too long to file its motion as emergent. *See Aiuto*, No. 1:19-cv-04803, Pls.' Resp. in Opp'n to Emergency Mot. for Sanctions (Dkt. 73), at 21 (N.D. Ga. Aug. 24, 2020). The plaintiffs also argued that it was their First Amendment right to post the notice as they saw fit. Acknowledging that it might have allowed the website posting if plaintiffs had sought its approval, the court ordered the website taken down within five days and sanctioned the plaintiffs by ordering that they pay the defendant's fees associated with seeking emergency relief. *Aiuto*, Order (Dkt. 79), slip op. at 6. *See also Sandoval v. Serco, Inc.*, 2019 WL 2075910, at *6-7 (E.D. Mo. 2019) (finding that plaintiffs' counsel's pre-conditional certification social media contacts with putative collective members circumvented the court's authority to oversee notice and were so improper as to justify sanctions).

In *Herrmann v. GutterGuard, Inc.*, the defendants learned from the plaintiffs' lawyers that they intended to distribute unauthorized notice by newspaper publication. No. 1:04-cv-00365, Defs.' Emergency Mot. (Dkt. 12), at 2 (N.D. Ga. Mar. 1, 2004). The defendants filed an emergency motion to stop them from doing so. The court ultimately issued an order governing how the parties

---

[1] The court had authorized notice to be distributed by U.S. Mail and email only.

3

could communicate with putative FLSA collective members. *Herrmann*, Order (Dkt. 110) (N.D. Ga. Aug. 17, 2004).[2]

Defendants' counsel Brett Bartlett was counsel for the defendants in *Maddox*, *Aiuto*, *Hermann*, and *Sandoval*. Kevin Young was counsel for the defendant in *Sandoval*. Experience in these cases, as well as counsel's broader experience litigating other FLSA cases, informed their view regarding the urgency of the relief that these Defendants sought in this case. That courts had granted emergency motions, at least in part, in the former three, and found that social media communications usurped a court's authority to oversee FLSA collective action notice in the other, caused the undersigned to feel confident in their approach here.

At least three other cases are instructive, as well. In 2003, Plaintiff's lead counsel, Richard Burch, filed an emergency motion to stop a defendant from communicating unilaterally with putative FLSA collective members before approved notice was distributed in *Belt v. EmCare, Inc.* 299 F. Supp. 2d 664, 665 (E.D. Tex. 2003). Belt argued, among other things, "[d]espite the duty of this Court to oversee and ensure a fair, unbiased and neutral notification of class members, [the defendant] chose to unilaterally communicate with potential class members regarding this action." *Belt*, No. 6:03-cv-00073, Pl.'s Emergency Mot. For Protective Order (Dkt. 53), at 5 (E.D. Tx. Nov. 25, 2003). The court granted Belt's emergency motion, finding the defendant "subvert[ed] both the Court's role in this collective action and the Court's approved notice by unilaterally sending a

---

[2] In *Baldridge v. SBC Communications, Inc.*, the defendants filed an emergency motion in this Court to stop the plaintiff's lawyer from distributing notice to putative FLSA collective members before the Court approved of the notice. No. 2:07-cv-00149, Defs.' Emergency Mot. (Dkt. 108) (N.D. Tex., filed Aug. 26, entered Aug. 27, 2004). That same day, the Honorable Judge Mary Lou Robinson granted the emergency motion to prevent premature issuance of notice, and approved the notice for distribution almost two months later. *See* Order Granting Mot. to Temporarily Stay Issuance of Notice (Dkt. 107) (N.D. Tx. Aug. 26, 2004); Amended Order (Dkt. 125) (N.D. Tx. Oct. 15, 2004). The undersigned, Brett Bartlett, was counsel in that case.

misleading and coercive letter to potential class members . . . ." *Belt*, 299 F. Supp. 2d at 670. Although *Belt*'s procedural posture differed because FLSA notice had been authorized already, the fundamental question posed by the emergency motion the court granted was the same as it is here: should the Court stop a party's unauthorized communications with putative collective members?

The plaintiff in *Belt* did not move the court for a preliminary injunction, but instead invoked Rule 23 and the Supreme Court's ruling in *Hoffman La-Roche* as the foundational grounds for the emergency motion. Thereafter, in *Vogt v. Texas Instruments, Inc.*, the defendant sought a preliminary injunction and restraining order to stop the plaintiffs' unauthorized communications with putative collective members. 2006 WL 4660133, at *1 (N.D. Tex. 2006). Even though cast as a motion for a temporary restraining order, the parties advised the court that *Belt*'s analytical framework should apply. The court agreed to apply *Belt*'s framework, but in conjunction with the standard applicable to preliminary injunctions *because* the defendant had applied for what amounted to such injunctive relief. *Id.* at *2 n.4. It is unclear from the court's order granting the defendant's motion in part and from the parties' briefing why the defendant applied for a preliminary injunction and did not file an emergency motion as the plaintiff did in *Belt*. The communications about which the defendant complained had begun with emails and other outreach approximately three months prior, *id.* at *1, and perhaps the defendant concluded that a preliminary injunction application might secure the court's fast attention. Indeed, the defendant filed its motion on May 15, 2006, and was heard three days later on May 18. *Id.* Although the court did not issue its order granting the motion, in part, until August of that year, it is clear that the defendant sought an urgent ruling from the court to stop the plaintiff's unauthorized communications.

More recently, in *Reyes v. Topgolf International, Inc.*, the court granted in part the defendants' "Emergency Motion for Protective Order to Prohibit and Remedy Misleading

5

Communications by Plaintiff's Attorney." 2017 WL 11496868, at *1 (N.D. Tex. 2017). The defendants filed their emergency motion on April 5, the court conducted a hearing on the motion on April 24, and the court issued an order on May 15. *Id.* The court noted that, in addition to relying on the court's inherent authority under Section 216 of the FLSA, "[i]n *Vogt*, the court also applied the traditional framework for preliminary injunctive relief because the defendant sought a temporary restraining order." *Id.* at *2 n.3. But the court determined that the preliminary injunction framework was *not* the only available approach in the situation: "Defendants do not seek a temporary restraining order in this case, so that analysis is unnecessary here." *Id.*

Defendants, here, perceived the need for court intervention to be pressing. This Court might not view the perceived need to have been emergent. But based on counsel's past experiences handling FLSA litigation, including certain of the cases cited and described herein, and a good faith interpretation of case law and orders addressing similar circumstances, Defendants and the undersigned believed they were asserting meritorious claims and contentions.

Defendants understand that part of the Court's concern about the labeling of the Motion is the Court's perception that Defendants "waited months" to file the Motion, thus suggesting that the request was not emergent. Respectfully, Defendants were reacting to evolving and changing circumstances. Defendants were aware of one advertisement in June 2020. At first, based on what they knew, Defendants did not believe the post warranted seeking immediate Court intervention. It was not until July 2020, and continuing into August 2020, that Defendants began receiving additional complaints from employees concerning additional advertisements they were seeing.[3] At

---

[3] In the Motion, Defendants stated, "[i]n June 2020, while Plaintiff was renewing his motion asking this Court to authorize and facilitate notice of this lawsuit to FieldCore employees, Defendants learned that Plaintiff and his counsel launched another flurry of ads targeting FieldCore employees." (Dkt. 102 at 1.) Defendants should have been more clear that they learned about the

6

that point, while also preparing to respond to Plaintiff's renewed conditional certification motion, Defendants began to consider that Court intervention would be necessary to put an end to Plaintiff's social media campaign, the intensifying frequency of which suggested, in Defendants' and the undersigned's view, both a concerted effort to usurp the Court's authority to regulate notice and a clear repudiation of the parties' prior agreement reached through conferral. Defendants prepared their Motion and filed it as soon as it was completed.

## II.     History of Conferral

In 2019, when Plaintiff's counsel first initiated their social media campaign, counsel for the parties conferred extensively over email and by phone. (*See* Dkt. 102-2.) Defendants' counsel made clear that they were prepared to file a motion to put a stop to what Defendants perceived to be improper online solicitations. Over the course of several days, Plaintiff's counsel pledged to take action to avoid the filing of such a motion, including to immediately cease their postings regarding FieldCore.

Later, in May 2020, Defendants discovered new postings concerning FieldCore's parent company and brought them to Plaintiff's counsel's attention. Plaintiff's counsel represented that those postings were inadvertently run, and terminated them. But with the renewed campaign that started the very next month, and the escalating frequency and vigor of new postings in and beyond July 2020, it became apparent that Plaintiff's counsel had repudiated their earlier agreement.

At that point, undersigned counsel believed that any further discussion with Plaintiff's counsel would be futile—both because Plaintiff would not have withdrawn the advertisements, and because even an assurance that Plaintiff's counsel would cease running the advertisements

---

advertisements over a period of time that began soon after the parties reached an impasse in negotiations, not in a single instance or moment.

would have provided Defendants with no greater assurance than the broken promise Plaintiff previously provided.[4] With Plaintiff's clear violation of their earlier agreement to stop advertising in exchange for Defendants not filing a motion, Defendants believed that Plaintiff's violation rendered further conferral futile.

Put a little differently: (a) Defendants believed they had conferred exhaustively in an effort to convince Plaintiff to stop their online campaign in exchange for Defendants' agreement to not file a motion to stop them; (b) Defendants secured that *quid pro quo* agreement; (c) Plaintiff breached the agreement; (d) Plaintiff's renewed advertising meant that the promise made during the prior conferral (i.e., Defendants will not file a motion if Plaintiff stops the advertisements) was broken, as was the subsequent assurance that the May 2020 posting was inadvertent and would cease; and (e) when the advertisements began again in June 2020 and escalated thereafter, Defendants believed the purpose of their conferrals had failed, that Plaintiff would oppose enforcing the original agreement after having withdrawn the inadvertent May posting but reinstituting the campaign in June, and that filing the Motion was appropriate.[5]

The undersigned did not intend to surprise Plaintiff or his counsel and did not intend to engage in any kind of bad faith gamesmanship intended to circumvent this Court's Rules. The undersigned thought they had fulfilled their obligation to confer, even if the conferral process was prolonged, with significant time passing and activity having occurred between the first discussions

---

[4] It might bear noting that, while Defendants and their counsel adamantly contest the claims that Plaintiff and his counsel make, communications among the parties and their counsel are generally respectful and certainly professional. Defendants' counsel know Plaintiff's counsel well, respect them, and are able to communicate openly with them about appropriate matters.

[5] Although not offered as an excuse for Defendants' misapprehension concerning the need for further conferral, Plaintiff's arguments and spirited opposition to the Motion in defense of their decision to run advertisements notwithstanding the parties' earlier agreement provide some insight as to the anticipated resistance from Plaintiff.

among the parties and Defendants' submission of their Motion.

As they move forward, Defendants understand that strict adherence to the Court's rules, including with regard to timing and conferral, is crucial. In particular, Defendants *and undersigned counsel* understand resoundingly that counsel must confer close in time to the filing of any motion under Local Rule 7.1(a). We will do so and will strictly adhere to these conferral requirements. Defendants' counsel apologizes for the inconvenience and irritation we caused the Court. Defendants and undersigned counsel request the Court to accept this Response as sufficient cause for use of "emergency" in the Motion and failing to timely confer concerning opposition to the Motion.

Date: September 15, 2020

Respectfully submitted,

/s/ *Brett C. Bartlett*
Brett C. Bartlett*
Georgia Bar No. 040510
bbartlett@seyfarth.com
/s/ *Kevin M. Young*
Kevin M. Young*
Georgia Bar No. 183770
kyoung@seyfarth.com
SEYFARTH SHAW LLP
1075 Peachtree Street, N.E., Suite 2500
Atlanta, Georgia 30309-3958
Telephone: (404) 885-1500
Facsimile: (404) 892-7056

COUNSEL FOR DEFENDANTS

*Admitted pro hac vice*

65801808v.1