**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION**

| | |
|---|---|
| HERMAN GREINSTEIN, Individually and For Others Similarly Situated,<br><br>　　　　　　Plaintiff,<br><br>　　v.<br><br>GRANITE SERVICES INTERNATIONAL, INC. and FIELDCORE SERVICES SOLUTIONS, LLC,<br><br>　　　　　　Defendants. | Case No. 2:18-cv-00208-Z-BR |

## **DEFENDANTS' REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

INTRODUCTION ..................................................................................................................1

I.  THE RECORD, INCLUDING PLAINTIFFS' OWN ADMISSIONS, ESTABLISH THEY SATISFIED THE DUTIES TESTS OF THE ADMINISTRATIVE AND PROFESSIONAL EXEMPTIONS ........................................3

　　A.  Plaintiffs Exercised Discretion and Independent Judgment with Respect to Matters of Significance ............................................................................................4

　　B.  Plaintiffs Satisfied the Professional Exemption.......................................................7

II.  FIELDCORE DOES NOT HAVE AN "ACTUAL PRACTICE" OF MAKING IMPROPER DEDUCTIONS FROM PLAINTIFFS' WEEKLY SALARIES ...................9

　　A.  The Few Anomalous Paychecks Plaintiffs Cite Do Not Establish an "Actual Practice" ......................................................................................................9

　　B.  This Court Should Reject Plaintiffs' Flimsy Objection to FieldCore's Explanation of Greinstein's Paycheck From a Single Week in 2016...................11

III.  PLAINTIFFS' PAY SATISFIED THE FLSA's SALARY BASIS TEST........................15

IV.  PLAINTIFF GREINSTEIN WAS A HIGHLY COMPENSATED EMPLOYEE............19

V.  PLAINTIFFS CANNOT SUSTAIN THEIR BURDEN OF ESTABLISHING THAT FIELDCORE WILLFULLY VIOLATED THE FLSA .........................................20

CONCLUSION....................................................................................................................22

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Acs v. Detroit Edison Co.*,
  444 F.3d 763 (6th Cir. 2006) ........................................................................... *passim*

*Anani v. CVS RX Services, Inc.*,
  730 F.3d 146 (2d Cir. 2013)........................................................................15, 21

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986).........................................................................................20

*Coates v. Dassault Falcon Jet Corp.*,
  961 F.3d 1039 (8th Cir. 2020) .....................................................................9, 17

*Douglas v. Argo-Tech Corp.*,
  113 F.3d. 67 (6th Cir. 1997) ...........................................................................16

*Ergo v. Int'l Merch. Servs.*,
  519 F. Supp. 2d 765 (N.D. Ill. 2007) ...............................................................9

*Fetrow-Fix v. Harrah's Entm't, Inc.*,
  2011 U.S. Dist. LEXIS 133696 (D. Nev. 2011) ...............................................9

*Hewitt v. Helix Energy Sols. Grp., Inc.*,
  15 F.4th 289 (5th Cir. 2021) (Ho, J.) .................................................15, 18, 21

*Hughes v. Gulf Interstate Field Servs.*,
  878 F.3d 183 (6th Cir. 2017) ..........................................................................18

*Klein v. Torrey Point Grp., LLC*,
  979 F. Supp. 2d 417 (S.D.N.Y. 2013)............................................................5, 6

*Litz v. Saint Consulting Group, Inc.*,
  772 F.3d 1 (1st Cir. 2014)................................................................................15

*Owsley v. San Antonio Indep. Sch. Dist.*,
  187 F.3d 521 (5th Cir. 1999) .............................................................................8

*Trammelll v. Amdocs, Inc.*,
  2018 U.S. Dist. LEXIS 27511 (N.D. Ala. 2018) ...............................................6

**Statutes**

29 U.S.C. § 213(a)(1)................................................................................................2

ii

**Other Authorities**

29 C.F.R. § 541.201(b) ...................................................................................................1

29 C.F.R. § 541.202 ......................................................................................................4

29 C.F.R. § 541.301 ......................................................................................................2

29 C.F.R. § 541.601(c) ..................................................................................................1

29 C.F.R. § 541.602 ........................................................................................14, 15, 19

29 C.F.R. § 541.603 ..................................................................................................9, 10

29 C.F.R. § 541.604(b) ................................................................................................15

29 C.F.R. § 778.104 ....................................................................................................14

29 C.F.R. § 541.301(d) ..................................................................................................7

U.S. DOL Wage & Hour Div., Field Ops. Hbk. § 22b03 (May 12, 1970) ...................16

U.S. DOL Wage & Hour Div., Op. Ltr. (Sept. 22, 1965), 1965 DOLWH LEXIS
    171..........................................................................................................................16

## INTRODUCTION

On July 22, 2022, Plaintiff Herman Greinstein testified under oath that "[t]he job of an EHS Specialist"—his job and that of the other Plaintiffs who joined his case—"was to ensure compliance with environment, health, and safety factors, programs, and procedures of Defendants and the government." Greinstein's "ultimate job duty" in this job, the exempt classification of which he challenges, "was to prevent onsite accidents. This included facility and site inspections, dealing with regulatory agencies, assessing risks, and conducting training based on Defendants' policies and procedures." (App.[1] 0039 [Greinstein Dep. 116] (referencing ECF 97-1 [Greinstein Decl. at ¶ 11]).)

By his own admission, Greinstein's most important duty, and that of those who joined his collective action based on his ardent claim that they are "similarly situated" to him, was to ensure health and safety, to "deal" with regulatory agencies on his employer's behalf, to "assess" risks, and to prevent onsite accidents. It is beyond reasonable dispute that this "ultimate responsibility" falls squarely within the type of work satisfying the duties test for the FLSA's administrative exemption. *See* 29 C.F.R. § 541.201(b) ("Work directly related to management or general business operations includes, but is not limited to, work in functional areas such as . . . *safety and health* . . . .") (emphasis added). And because his job satisfies the administrative exemption's duties test, it is even more absurd for Greinstein to suggest that it does not satisfy the "highly compensated employee" exemption's lenient duties test. *See id.* § 541.601(c) (because "[a] high level of compensation is a strong indicator of an employee's exempt status, . . . eliminating the need for a detailed analysis of the employee's job duties," a highly

---

[1] References to "App." refer to the Appendix filed with FieldCore's motion for summary judgment (ECF 196). "Because Granite no longer exists, FieldCore is the only Defendant in this case." ECF 215 at 1 (Jan. 17, 2023 Order). As a result, the Court has directed "the United States District Clerk to conform the docket to reflect Defendant's correct name." *Id.*

compensated employee is exempt if he "customarily and regularly performs any one or more of the exempt duties or responsibilities of an executive, administrative or professional employee . . . .").

FieldCore has established that the duties and responsibilities that Greinstein undertook satisfy *at least* the administrative and highly compensated employee exemptions' "duties tests." It has done so by directing this Court to a multitude of Greinstein's and the other Plaintiffs' own admissions during their depositions and elsewhere. Because of the high level of wizened skill regarding the environment, health, and safety that Greinstein and others used to accomplish their work, all proved by Plaintiffs' own admissions, FieldCore has also established that Greinstein's duties satisfied the FLSA's professional exemption, as the work that he did was the equivalent of that performed by an employee performing similar work necessitating an advanced degree. *See* 29 C.F.R. § 541.301(a) & (d) (noting that the "the exemption is also available to employees in such professions who have substantially the same knowledge level and perform substantially the same work as the degreed employees, but who attained the advanced knowledge through a combination of *work experience* and intellectual instruction") (emphasis added). This Court's determination that the important work that Plaintiffs concede they did satisfies the test for one or more exemption would be consistent with Congress's intent to exclude from the FLSA's overtime requirements those employees "employed in a *bona fide* . . . administrative, or administrative capacity." 29 U.S.C. § 213(a)(1).

Plaintiffs cannot avoid the conclusion that the duties that they performed were critically important, judgment-laden, and exempt. For individuals who bore chief responsibility for evaluating and overseeing the safety of large-scale power plant facilities to argue otherwise, suggesting that their jobs were unimportant and mechanical, is ludicrous.

Duties aside, FieldCore devotes the bulk of its reply to addressing: (1) Plaintiffs' unfounded, individualized "objection" to "FieldCore's attempt to explain why it didn't pay Greinstein his full salary for the week of October 3, 2016." (2) Plaintiffs' argument that, despite their having accepted FieldCore's promise to pay them *weekly* no less than a predetermined salary, *plus* substantial additional pay on top of their salary in busier weeks, and despite receiving that weekly pay in all of the hundreds of weeks they place at issue in all but one alleged instance, they were not paid on a salary basis. And (3) Plaintiffs' argument that, despite the abundant evidence proving that FieldCore reasonably availed itself of more than one of the Act's overtime pay exemptions, it nevertheless willfully violated the FLSA.

All things considered, this Court should enter summary judgment against Greinstein and the other Plaintiffs, individually and on the whole, as to each claim that they assert.

## I.   THE RECORD, INCLUDING PLAINTIFFS' OWN ADMISSIONS, ESTABLISH THEY SATISFIED THE DUTIES TESTS OF THE ADMINISTRATIVE AND PROFESSIONAL EXEMPTIONS

Contrary to Plaintiffs' suggestion that FieldCore did not proffer evidence establishing the duties that they performed, the record is replete with FieldCore's affirmative evidence *proving* those duties, all of which engages and supplements Plaintiffs' own testimony that would in any event stand on its own to justify entry of summary judgment against them. One straightforward example: the job description for the job whose classification Plaintiffs challenge describes a multitude of quintessentially exempt job duties; and Greinstein—for one—admits he performed each such duty throughout his time with FieldCore. (App. 0050-0054 [Greinstein Dep. 135-139].) FieldCore incorporates by reference its motion for summary judgment and submissions filed in support. Particularly, with respect to the duties Greinstein and the other Plaintiffs performed, FieldCore refers the Court to the facts summarized in sections I.A, II, III, and VI in its Brief in Support of Motion for Summary Judgment (ECF 195 at 3-19).

### A.   Plaintiffs Exercised Discretion and Independent Judgment with Respect to Matters of Significance

Plaintiffs acknowledge that their primary job duty was to ensure compliance with the FieldCore policies and government regulations, specifically with respect to "compliance with environmental, health, and safety factors." (ECF 213 at 28.) They do not dispute that the EHS function, with its goal of preventing serious accidents at its clients' sites—including catastrophic injury, loss of life, and destruction of property—is an important and significant one. Plaintiffs' only argument is that their primary duty "didn't include the exercise of discretion and independent judgment." (ECF 213 at 29.) They assert that they "weren't free to make decisions." (*Id.*) The record indicates otherwise.

 "The phrase 'discretion and independent judgment' must be applied in the light of all the facts involved in the particular employment situation in which the question arises." 29 C.F.R. § 541.202(b). "[E]mployees can exercise discretion and independent judgment even if their decisions or recommendations are reviewed at a higher level" and "may consist of recommendations for action rather than the actual taking of action." 29 C.F.R. § 541.202(c). The regulations do not prescribe a mechanical checklist, but some "[f]actors to consider . . . include, but are not limited to: whether the employee has authority to formulate, affect, interpret, or implement management policies or operating practices; . . . to commit the employer in matters that have significant financial impact; . . . whether the employee investigates and resolves matters of significance on behalf of management; and whether the employee represents the company in handling complaints, arbitrating disputes or resolving grievances." § 541.202(b). "The factors are illustrative, but neither exclusive nor inclusive, and courts have often found that a given employee exercised discretion and independent judgment sufficient to satisfy the

requirement even when only a few of the factors were met." *Klein v. Torrey Point Grp., LLC*, 979 F. Supp. 2d 417, 428–29 (S.D.N.Y. 2013).

The record, including Plaintiffs' own testimony, demonstrates that their job was anything but rote. Greinstein, for example, testified about the safety-conscious culture that he helped to inspire, a job that was made easier or harder depending on the customer and the project: "They're different all the time. Different managers. Different employees." (Reply App.[2] 0003 - 0004 [Greinstein Dep. 84:7-85:4].) Greinstein, with many years of varied experiences, was "humbled to know" the ins and outs of which OSHA standards applied in different situations, and how to use safety equipment to protect employees, for example using an anemometer to determine when certain types of work should stop due to unsafe wind conditions, or using his judgment to determine when a crane inspection was done by "[a] good reputable company versus one that isn't." (Reply App. 0005 – 0010; Reply App. 0013 - 0016 [Greinstein Dep. 86-91; 94-97].) And if he identified a safety problem, Greinstein engaged with the site manager, an employee of FieldCore's customer General Electric, to remedy it. (Reply App. 0011 - 0012 [Greinstein Dep. 92:16-93:22].)

The testimony of other Plaintiffs is in accord. They worked with minimal supervision and on projects with varying needs and complexity. (Reply App. 0023 [Oberndorfer Dep. 71:2-23] ("[E]very day was a challenge and different. And so, yeah, you had to employ the innovative thinking."); Reply App. 0029 [Speer Dep. 109:6-110:9] (testifying about performing his job with "[o]utstanding customer service, strong communication skills, effective multi-tasking, flexibility," as well as the "[a]bility to foresee hazards and risks long before they occur" and needing to "looking outside the box"); Reply App. 0041 - 0045 [Starr Dep. 47:15-51:21]

---

[2] References to "Reply App." refer to the Reply Appendix filed contemporaneously with this reply brief.

(testifying that "you have to use judgment in how you deal with people and how you coach" everyone from "[c]raft millwrights" to "engineers," including deciding when "to involve their supervisor").) EHS Specialists also had "stop work authority," which some exercised "multiple times" if they recognized a circumstance "immediately dangerous to life and health." (Reply App. 0048 – 0050 [Starr Dep. 113:11-114:3, 115:5-12].) Short of that, they could call for a "refocus or a safety standdown" to correct undesirable behaviors of less immediate concern, at their discretion. (Reply App. 0049 – 0050 App. [Starr Dep. 114:13-115:4].)

While some projects were staffed with two or more EHS Specialists, many relied on just one. (*See, e.g.*, Reply App. 0054 [Jackson Dep. 71:5-71:17] (explaining that about "95 percent of the time" he was "the only EHS manager for a project"); Reply App. 0039 - 0040 [Starr Dep. 45:23-46:24] ("[I]t's important to have at least one role solely dedicated to preventing  injuries . . . . Some projects have multiple EHS people.· Others, it's just me.).) Different EHS Specialists could also utilize different approaches; for example, different EHS Specialists would conduct an event analysis in different ways depending on "how they were trained" and their "school of thought." (Reply App. 0058 [Farmer 146:7-20] (explaining how he conducted a root cause analysis).) EHS Specialists also voiced their opinions on changes to policies and procedures on a regular basis in "weekly video conference meetings with the regional managers of the [customer] General Electric." (Reply App. 0021 - 0022 [Oberndorfer Dep. 64:21-65:7] ("I mean, whatever we need to change we could voice our concerns and . . . that's why the policies were consistently changing . . . .").)

At bottom, the evidence "is so one-sided" based on Plaintiffs' own admissions that no reasonable jury could find that they do not meet the duties tests of at least one exemption. *See, e.g., Trammelll v. Amdocs, Inc.*, 2018 U.S. Dist. LEXIS 27511 (N.D. Ala. 2018) (finding

plaintiff's admissions unequivocally established duties satisfying the highly compensated employee exemption's test); *Klein*, 979 F. Supp. 2d at 429 (granting employer summary judgment on administrative exemption based on "Plaintiff's own testimony").

### B.    Plaintiffs Satisfied the Professional Exemption

Plaintiffs argue that "[t]he professional exemption is limited to positions where a standard prerequisite for the job requires specialized academic training." (ECF 213 at 30.) Plaintiffs also argue that "[b]eing an EHS Specialist requires nothing more than a high school diploma." (ECF 213 at 31.) They are wrong on both counts.

The regulations expressly state that the professional exemption "is also available to employees in such professions who have substantially the same knowledge level and perform substantially the same work as the degreed employees, but who attained the advanced knowledge through a combination of work experience and intellectual instruction." 29 C.F.R. § 541.301(d). In hiring for the EHS Specialist role, FieldCore requires either a "Technical/University degree or qualifying experience" or "a High School Diploma/GED with a minimum of 4 years of experience in a EHS role." (Reply App. 0088 - 0089 [EHS Specialist Job Description at FC_GREINSTEIN_000591-592].) In other words, someone with "nothing more than a high school diploma" or GED, as Plaintiffs claim (ECF 213 at 31), would not qualify to be an EHS Specialist. Greinstein himself satisfied this requirement with experience decades of experience in an EHS role dating back to 1983, in addition to his high school diploma. (App. 0053 [Greinstein Dep. 138:4-15].) FieldCore further requires a "NEBOSH National General Certificate or equivalent or working towards an Occupational Safety qualification" as well as "2+ years of work experience and training that provides the knowledge, skills and abilities necessary to perform the work." (Reply App. 0089 [EHS Specialist Job Description at FC_GREINSTEIN_000592].)

Plaintiffs satisfied these minimum education and qualification requirements in different ways. Greinstein testified, for example, that he relied on his training, education, and experience to be able to perform his various duties. He was a member of the American Society of Safety Engineers. (App. 0030 [Greinstein Dep. 60].) He has advanced occupational safety education through OSHA training, equivalent to an OSHA 500 or OSHA 510 today. (App. 0031-0032 [Greinstein Dep. 61-62].) He is an expert regarding OSHA standards and regulations. (App. 0019-0020 [Greinstein Dep. 23-24].) He relied on the knowledge gained from his training and experience to understand which of the complex and myriad OSHA standards governed various situations and "how to apply them when you see it in the field." (App. 0021-0027, 0032 [Greinstein Dep. 36-41; 62].)

As another example, Eric Farmer is "a nationally registered paramedic through the NREMT [National Registry of Emergency Medical Technicians]" and at the time of his deposition was "enrolled in a bachelor's degree program for occupational safety and health" with an expected graduation date in 2022. (Reply App. 0057 [Farmer Dep. 9:12-21].) Byron White was certified as a Construction Health and Safety Technician (CHST) and a Safety Management Specialist (SMS) by the Board of Certified Safety Professionals [Reply App. 0061 – 0068 White Dep. 28-35].) White also possessed OSHA 10, 30, 510, and 500 certifications and a First Responder CPR certification. (Reply App. 0069 - 0072 [White Dep. 55-58].) Matthew Starr was a Certified Safety Professional (CSP), which requires not only initial study "over a long period of time," but also a bachelor's degree and "four years of safety experience," plus a certain number of "continuing education unit[s]" each year. (Reply App.0033 -  0039 [Starr Dep. 39-45].)

Because Plaintiffs are wrong that the EHS Specialist position requires only a high school diploma, their attempt to distinguish *Owsley v. San Antonio Indep. Sch. Dist.*, 187 F.3d 521 (5th

Cir. 1999) (ECF 213 at 31), is unavailing. As in *Owsley*, the employees here were required to undergo professional training and obtain relevant certifications to adequately perform their job.

## II.   FIELDCORE DOES NOT HAVE AN "ACTUAL PRACTICE" OF MAKING IMPROPER DEDUCTIONS FROM PLAINTIFFS' WEEKLY SALARIES

Plaintiffs concede that their salary basis claims are valid only "if the employer has an 'actual practice' of making improper deductions." (ECF 213 at 15.) "An **actual practice** of making improper deductions demonstrates that the employer did not intend to pay employees on a salary basis." (ECF 213 at 15 (citing 29 C.F.R. § 541.603(a)) (emphasis in Plaintiffs' brief).

### A.   The Few Anomalous Paychecks Plaintiffs Cite Do Not Establish an "Actual Practice"

Out of the "911 total workweeks within the 3-year statute of limitations" Plaintiffs place at issue, they allege that just "twice" they did not receive their full weekly salary. (Pls.' Appx. 236 ¶ 8; ECF 213 at 7.) Aside from those two weeks out of 911 (i.e. 0.2%), Plaintiffs introduce twelve pay records—out of thousands produced—from "other overtime lawsuits" Plaintiffs' attorneys have filed against FieldCore in other jurisdictions. (ECF 213 at 7; Pls.' Appx. 064-070, 140-144.) Far from showing an "actual practice" of improper deductions, this relatively minuscule number of weeks in which employees were *allegedly* not paid their full weekly salary demonstrates that such instances are aberrations—the exact opposite of a policy or practice.[3]

---

[3] Plaintiffs cite a couple cases to suggest otherwise: *Fetrow-Fix v. Harrah's Entm't, Inc.*, 2011 U.S. Dist. LEXIS 133696 (D. Nev. 2011); and *Ergo v. Int'l Merch. Servs.*, 519 F. Supp. 2d 765 (N.D. Ill. 2007). (ECF 213 at 15). In *Fetrow*, the court granted summary judgment to the employer, finding the plaintiff-employees were exempt despite proof of multiple allegedly improper salary deductions, where the number of alleged deductions were relatively few compared to all pay periods, the reasons for the deductions were either varied or unexplained, the affected employees worked under more than one supervisor, and there was a policy for employees to report improper deductions. In *Ergo*, the court found a salary basis violation for employees in a single internal sales department where a policy provided expressly for safety-related pay deductions—which the court found to be *actually* unlawful under the FLSA—that were *in fact taken* from the named plaintiffs' pay and could have been taken from other at-issue employees in their particular internal department. If this Court considers either case persuasive,

Indeed, FieldCore's intent has always been that "in accordance with state and federal laws . . . if you are an exempt employee, you will receive a salary regardless of the hours you work in that week should you perform work." (App. 0159 [Abel 30(b)(6) Dep. 66:3-16].) When it comes to actual practice, FieldCore's policy is backed up by "programs from a system perspective . . . the programming of that is done in a way that is in compliance with U.S. wage laws." (App. 0160 [Abel 30(b)(6) Dep. 67:2-16].) In other words, FieldCore's actual practice is to pay its exempt employees "their full salary if they work *any hours* that week." (Reply App. 0075 [Wadsworth Dep. 102:15-20] (emphasis added).) For the Plaintiffs in this case, "the rule is that if they work, if they have hours worked, that they will receive their weekly salary." (Reply App. 0078 [Johnson Dep. 31:17-24].) That is, if they work any hours, FieldCore's payroll software "generates their weekly salary." (*Id.*)

And if for some reason there are compensation errors, and "if an employee has a concern or if there's any concern that's raised, [FieldCore] thoroughly investigate[s] and if there's any changes that need to be made or adjustments, then they're done." (Reply App. 0079 [Johnson Dep. 39:9-19].) Plaintiffs do not dispute that, according to FieldCore policy, employees' complaints of underpayment, or mistaken payment, of wages would be investigated and, if validated, corrected. Such policies guard the exempt status of employees suffering impermissible pay deductions. *See* 29 C.F.R. § 541.603(d).

The testimony of multiple Plaintiffs in this case reflects the reality that FieldCore's payroll systems worked. When asked, virtually every Plaintiff (other than Greinstein) testified that they *never* received less than their predetermined weekly salary in the weeks they worked.

---

both in fact justify the conclusion that Plaintiffs' pay satisfies the salary basis test for the FLSA's exemptions. Plaintiffs fail to sustain their burden to prove otherwise. *Coates v. Dassault Falcon Jet Corp.*, 961 F.3d 1039, 1047-48 (8th Cir. 2020) ("Plaintiffs have the burden on this issue.").

This includes when they worked fewer than 40 hours. For example, when asked if he ever received less than his full weekly salary in the weeks that he recorded fewer than 40 hours, Plaintiff Matthew Starr responded: "No. That's never happened." (Reply App. 0046 - 0047 [Starr Dep. 103:11-104:2].) Plaintiff Culton Speer likewise confirmed that he received his predetermined salary each week, just as his offer letter said he would, even when he worked fewer than 40 hours. (Reply App. 0028 [Speer Dep. 66:7-17].) So did Plaintiff Calvin Oberndorfer. (Reply App. 0024 [Oberndorfer Dep. 80:10-24].) And Plaintiff Edwin Collazo. (Reply App. 0082 - 0083 [Collazo Dep. 99:25, 100:2-18].) When asked if he received his $1,840 weekly salary for each week that he worked, Plaintiff Stephen Jones answered simply: "Yes." (Reply App. 0087 [Jones Dep. 92:16-25].) Greinstein's testimony to the contrary sets him apart.

**B.    This Court Should Reject Plaintiffs' Flimsy Objection to FieldCore's Explanation of Greinstein's Paycheck From a Single Week in 2016**

Out of the two times total that Plaintiffs in this case allegedly suffered improper deductions, Plaintiffs specifically identify only one of them: a singular period in 2016 in which Greinstein received eight hours of pay. (Pls.' Appx. 063.)

Dissatisfied that FieldCore's explanation of this one-off occurrence resolves the issue, Plaintiffs urge the Court to ignore the explanation. (ECF 213 at 4-6.) There's no reason to do so.

Long before discovery in this case concluded, one of FieldCore's corporate representatives, Michael Scott, testified that:

> I understand that Greinstein has alleged in his lawsuit that in a single workweek in October 2016—the last week of his first project as an employee of Granite—he recorded and was paid for 8 hours of Demobilization Time (i.e., time spent driving home from a project) at a rate of $45 per hour, but did not receive his salary. To the extent Greinstein did not receive a weekly salary in this week, it is because he recorded his time incorrectly on his timesheets.

(App. 0005 [Scott Decl. ¶ 23].)[4]. Scott also testified that:

> Greinstein, and other EHS Managers . . . were required to record at least 40 hours each week on their time sheets. To the extent Greinstein performed only 32 hours of actual work, he was required to enter the 32 hours of work time, plus 8 hours of unproductive time, so he would be paid his weekly salary of $1,800.

(App. 0005 [Scott Decl. ¶ 21].)[5]

Greinstein admitted during his deposition that he did not remember that singular week when he was paid eight hours and not his full salary. (App. 0041-0042 [Greinstein Dep. 125-126].) He does not recall what days, if any, during the week in question he worked. *Id.* He does not know if he spent time riding his motor cycle, playing with grandchildren, or working for another employer during the days of that week that he didn't work for FieldCore, whenever they were, though he *does* know he didn't do any work for FieldCore on those days. (App. 0044-0048, 0055-0056 [Greinstein Dep. 128-132, 153-154].) Perhaps the only thing Greinstein does know about this episode: he did not complain about the eight-hour pay that he received for the week. (*See* App. 0057 [Greinstein Dep. 173:2-7] (testifying that he never spoke to anyone in Payroll about his pay).) Greinstein's supervisor, Mr. Scott, noted that Greinstein never raised an issue regarding this week with him either. (App. 0006 [Scott Decl. ¶ 25].)

But Plaintiffs object, now, to FieldCore's explanation for the single instance of 8-hour pay, incorrectly claiming that Vanessa Johnson's testimony about it was the first time they heard

---

[4] Scott's declaration was signed June 3, 2019 and previously submitted with FieldCore's responses to Plaintiffs' 2019 and 2020 motions to certify a collective action. (*See* ECF 38-2 & 104-2.) Plaintiffs acknowledge that Scott was "also designated a[s] FieldCore's corporate representative." (ECF 213 at 36.)

[5] "FieldCore has since put a mechanism in place to ensure that when a salaried exempt employee (who is paid under Greinstein's compensation plan) records any time, even if less than 40 total hours, he receives his full predetermined salary for that week." (App. 0006 [Scott Decl. ¶ 24].) That mechanism was established through software programming in 2017. (Pls' Apx'. 238 [Johnson Dep. 38:20-22].)

that it was the result of Greinstein's mistake. (ECF 213 at 10-11.) Swinging for the fences with a broken bat, they claim that because FieldCore did not disclose the explanation until after discovery closed (*i.e.*, for the first time by declaration submitted with their summary judgment motion), they could not adequately explore it before having to respond to it in their opposition to summary judgment.

Plaintiffs' objection is invalid for at least two reasons. First, Michael Scott had already discussed the single workweek at issue in his 2019 declaration (*see supra*). Second, shortly before Ms. Johnson's deposition, FieldCore reminded Plaintiffs' counsel in open court, on the record, that "FieldCore has designated Vanessa Johnson, payroll manager, to discuss the details of how the pay plan here actually operates. Ms. Johnson can testify as to pay statements . . . how people are paid in certain weeks. Ms. Johnson is prepared to testify as to all of that." (Reply App. 0109 [Nov. 3, 2022 Hearing Transcript at 20:16-19].) *But Plaintiffs chose not to ask Ms. Johnson about Greinstein's pay for the week in question.*

Instead, Plaintiffs now suggest that because one of FieldCore's other 30(b)(6) witnesses—John Wadsworth—testified that he did not know why Greinstein was not paid his full salary for that week, that Mr. Wadsworth's lack of knowledge on this particular question somehow bound FieldCore into an inability to provide the explanation (which it had, in fact, provided as early as 2019). Plaintiffs' position is untenable because, as FieldCore explained in a court hearing while Mr. Wadsworth's deposition was paused, "[Plaintiffs' counsel] is looking at this topic very differently from what FieldCore said with regard to presenting Mr. Wadsworth to talk specifically regarding deductions, and what [Plaintiffs' counsel] is asking about [in the deposition] are not deductions." (Reply App. 0110 [Nov. 3, 2022 Hr'g Tr. at 21:16-20].) As another 30(b)(6) witness, Bella Abel, testified, FieldCore makes deductions for "benefits and

13

self-elected benefits" such as medical and dental. (Abel 30(b)(6) Dep. at 153:5-18.) As a matter of policy and practice, FieldCore does not make deductions from employees' salaries for working less than 40 hours, as "they'll receive the same weekly salary regardless of hours worked." (*Id.* at 147:7-15.)

With this context, it becomes clear that Plaintiffs' objection is a distraction, at best. As an initial matter, Greinstein's claims don't even reach back to October 2016—they reach back to November 2, 2016, two years before he filed suit (they'd reach back three only if he could prove a willful violation of the law, which he can't). And even if they did, the single instance that Plaintiffs try to stretch into proof of widespread, unlawful salary deductions is insufficient to *disprove* their salary basis pay.

In any event, FieldCore does not concede that Plaintiffs suffered any impermissible reduction of their pay. On this singular occasion Greinstein claims, if it is taken as true that he worked one day that week, he still admits he either attended to personal matters *or even worked for another employer* during the rest of the week, such that FieldCore did not need to pay him for his other full days off. *See* 29 C.F.R. §§ 541.602(b)(1) (*e.g.*, "if an employee is absent for two full days to handle personal affairs, the employee's salaried status will not be affected if deductions are made from the salary for two full-day absences"), and -.603(e) (keeping in mind that "[these provisions] shall not be construed in an unduly technical manner so as to defeat the exemption"). But to the extent those days off without pay might otherwise have endangered his exempt status, FieldCore's § 603(d)-compliant policy, discussed *supra*, guards his exempt status.[6]

---

[6] Even if it did not, taking the evidence in his favor, Greinstein worked only 8 hours that week and would not be entitled to overtime if he were deemed misclassified for that week alone. See

Finally, this Court should overrule Plaintiffs' "objection to summary judgment evidence" because it may consider all facts and reasonable inferences drawn from the record. Vanessa Johnson's declaration is part of that record. Michael Scott's declaration, and the explanation of Greinstein's eight-hour pay week that it contains, is also part of the record—and it has been since 2019. If Plaintiffs' lawyers failed to explore further that explanation, provided by one of FieldCore's corporate representatives, having had ample notice to do so, it's on them. FieldCore did not disavow the prior explanation (and Plaintiffs don't claim that it did). At most, all Ms. Johnson's testimony did was further explain Mr. Scott's prior testimony provided on FieldCore's behalf. This Court should disregard and overrule Plaintiffs' objection.

## III.   PLAINTIFFS' PAY SATISFIED THE FLSA'S SALARY BASIS TEST

Plaintiffs argue that because they received premium pay for working over 40 hours in a week, that somehow made them "hourly" employees. (ECF 213 at 13.) Courts have repeatedly rejected this argument. Compensation plans like Plaintiffs' have been upheld as providing salary basis pay for decades. *See, e.g.*, *Acs v. Detroit Edison Co.*, 444 F.3d 763 (6th Cir. 2006). Employees paid a predetermined amount on a weekly basis are axiomatically "paid on a salary basis," *even if* they record their time hourly, receive additional hourly pay for time beyond 40 hours per week, and occasionally have deductions taken from their pay because of mistaken time entry. *Id.* at 765.

Cases like *Anani* and *Litz*, as well as *Helix*, align squarely with that conclusion, as FieldCore explains in its opening brief. *See Anani v. CVS RX Services, Inc.*, 730 F.3d 146 (2d Cir. 2013) (employee exempt when paid weekly, plus hourly rate for hours beyond 44, where hourly rate was determined by dividing 44 into weekly pay amount); *Litz v. Saint Consulting*

---

29 C.F.R. §§ 778.104 ("Each workweek stands alone.") and -.105 ("An employee's workweek is a fixed and regularly recurring period of 168 hours—seven consecutive 24-hour periods.").

*Group, Inc.*, 772 F.3d 1 (1st Cir. 2014) (employees exempt when paid hourly rate of between $40 and $60 multiplied by hours worked, with a $1,000 weekly guarantee); *Hewitt v. Helix Energy Sols. Grp., Inc.*, 15 F.4th 289, 297 (5th Cir. 2021) (Ho, J.) ("[T]here is no actual conflict here [with *Anani* and *Litz*]. That is for one simple reason that should be apparent from the face of the regulations: *Litz* and *Anani* involve pay calculated 'on a weekly, or less frequent basis' (29 C.F.R. § 541.602(a))—and not pay 'computed on . . . a daily . . . basis' (§ 541.604(b)."). And, of course, this Court's finding in *Trottier* that weekly-paid, highly compensated employees employed by FieldCore and performing duties analogous to Plaintiffs are exempt aligns, as well.

The Sixth Circuit's ruling in *Acs* provides historical perspective that contextualizes Plaintiffs' attempt to upend the well-reasoned axiom that they challenge. In *Acs*, the plaintiffs were exempt employees employed by (at the time) the seventh largest utility service in the U.S. and who worked varying numbers of hours per week—sometimes 36 and sometimes 48. *Id.* at 765-66. After setting their annual salaries, Detroit Edison "converted" their salaries into weekly amounts and then divided by 40 to determine their "regular hourly" rate. *Id.* While it instructed them to record 40 hours per week to ensure they received a weekly salary, employees would be paid less than that if they did not; and occasionally they did not. *Id.* It paid "'straight-time' overtime compensation—in other words, additional compensation at the exempt employee's 'hourly' rate for hours worked beyond 40 in a workweek." *Id.* at 768.

Rejecting the plaintiffs' claim that their pay did not satisfy the FLSA's salary basis test, the court put to bed many of the challenges that Greinstein and his fellow Plaintiffs raise here. For example, the court acknowledged that "it has long been clear that an employer may satisfy the salary-basis test even though it chooses to pay salaried employees on an hourly basis." *Id.* (quoting *Douglas v. Argo-Tech Corp.*, 113 F.3d. 67, 71 (6th Cir. 1997) ("The Wage-Hour

Administrator of the Labor Department has advised that hourly employees may be salaried if they are guaranteed a predetermined number of paid hours.") (citing U.S. DOL Wage & Hour Div., Op. Ltr.[7] (Sept. 22, 1965), 1965 DOLWH LEXIS 171; U.S. DOL Wage & Hour Div., Field Ops. Hbk. § 22b03 (May 12, 1970)). The court went on to discuss approvingly the tenets of a 2003 opinion issued by the Wage and Hour Division's Administrator that examined a pay policy providing additional hourly pay for "overtime" work and for employees to record their hourly time, with the acknowledgement that "employee time-entry errors or omissions" might occur, resulting in payment of less than the promised salary. *Id.* at 768-69 (discussing Op. Ltr., 2003 DOLWH LEXIS 3, at *1-7). .

Ultimately the court of appeals in *Acs* affirmed summary judgment in the employer's favor, even though the employee's pay was reduced to an hourly rate and even though mistakes and omissions might cause underpayment, , because Detroit Edison paid its employees on a salary basis and thus proved the same core exemptions that Plaintiffs place at issue here. *Id.* at 770-71.

Citing *Acs* approvingly, the Eight Circuit in *Coates v. Dassault Falcon Jet Corp.*, 961 F.3d at 1045, explained that "no matter how much [an employer's] method of compensation resemble[s] payroll procedures for the typical hourly wage-earner," employees may be classified as exempt when the employer gave advance notice that it would pay them a salary set at a

---

[7] In 1965, the U.S. DOL's Wage and Hour Division Administrator concluded, "the regulations do not require that the predetermined weekly amount required [to satisfy an exemption's salary test] constitute or govern the employee's total weekly compensation. The salary requirement would be satisfied by a payment in the prescribed amount which is guaranteed to the employee for each week in which he performs any work on a project or projects for the employer, even though this is only a portion of the compensation paid him for such work and the total amount continues to be measured by an hourly . . . rate. . . . [B]y simply guaranteeing the employee when he is employed for the project that his payment at the agreed rates in each week when he works on the project will not be less than an amount equal to the amount prescribed in the regulations."

predetermined amount. 961 F.3d at 1045. "The FLSA requires no other contractual 'bells and whistles.'" *Id.* Reversing summary judgment granted in the *plaintiffs'* favor, the court found *inter alia* that *neither* a 30(b)(6) representative's confusing testimony about salary versus hourly pay and pay reductions *nor* evidence that employees suffered improper deductions at the hands of the same managers established that the employer failed to pay the plaintiffs on a salary basis. *Id.* at 1044-48. Quite the contrary here, FieldCore has established beyond dispute that it guaranteed Plaintiffs it would pay them a predetermined amount on a weekly basis; and Plaintiffs do nothing to carry their burden of proving otherwise.

Like in *Acs*, summary judgment for the employer is proper here, too. Before their employment began, FieldCore clearly described Plaintiffs' salary in the offer letters that each Plaintiff signed, accepting the exempt jobs offered to them. It paid the guaranteed predetermined amount that it described in those offer letters for each week that Plaintiffs worked. To the extent it ever *underpaid* a Plaintiff relative to that amount, such that the underpayment could *conceivably* be claimed to be impermissible, there is nothing in the record to suggest that the underpayment was the result of anything other than a mistaken time entry. (*See supra.*) FieldCore paid additional compensation for hours worked over 40 on an hourly basis, just as Detroit Edison paid its employees. For example, as Greinstein testified, he was paid his predetermined weekly amount, "and then anything over the 40 hours [he] was paid at the same rate," just like his offer letter said he would be. (Reply App. 0017 [Greinstein Dep. 133:11-25].) The Sixth Circuit's decision in *Acs* is on all fours, as the result here should be.[8]

---

[8] That court's decision in *Hughes v. Gulf Interstate Field Servs.*, on which Plaintiffs rely, does not alter this conclusion. 878 F.3d 183 (6th Cir. 2017). In *Hughes*, unlike Detroit Edison in *Acs*, the defendant committed verbally to pay welding inspectors *by the day* at an amount that, when multiplied by the number of days worked, would satisfy the FLSA's salary *level* requirement. It did not promise in advance of the work performed that it would pay the employees a specified

And, of course, the entry of summary judgment on Plaintiffs' claims *in this case* is proper *despite* what appears to be a last-ditch attempt by Plaintiffs and their lawyers to preserve the singular "reasonable relationship test" issue for appeal. The question of whether that test applies to employees and pay plans like those that Plaintiffs challenge has been answered: when an employee is paid on a weekly basis, the reasonable relationship has no bearing on the employee's exempt status. This Court determined as much in *Trottier*. Judge Ho and the Fifth Circuit did so in *Helix*. So, as with Plaintiffs' windmill-tilting arguments about the duties they performed, FieldCore will not waste the Court's time with additional retort concerning a question already resolved.[9]

## IV.    PLAINTIFF GREINSTEIN WAS A HIGHLY COMPENSATED EMPLOYEE

As discussed above, FieldCore has established, based on the record evidence, that there can be no genuine dispute that Greinstein and the other Plaintiffs were lawfully classified exempt under the administrative and professional exemptions. The Court need go no further to dispose of Plaintiffs' claims, but if it does, Greinstein's compensation and duties also satisfied the test for the highly compensated employee exemption. Plaintiffs' argument that Greinstein was "never" a highly compensated employee relies on an improper, artificially narrow construction of the relevant regulation. (ECF 213 at 10.) Instead, the Court must assess the HCE exemption's compensation prong in light of the Supreme Court's decision in *Encino Motorcars*, instructing

---

salary; and so, noted the court, it was not bound to pay a predetermined amount that it had guaranteed on a weekly basis, dooming the defendant's salary basis argument. *Id.* 191-93.

[9] Plaintiffs' reasonable relationship arguments lack foundation in fact and law, as FieldCore demonstrates in its opening brief. (ECF 195 at Section VI.A, at 37 *et seq.*) Also lacking foundation in the law is Plaintiffs' suggestion that FieldCore could not classify them as exempt if it did not pay them in weeks when they did not work. The FLSA regulations could hardly be clearer: "Exempt employees need not be paid for any workweek in which they perform no work." 29 C.F.R. § 541.602(a)(1).

courts not to interpret FLSA exemptions "narrowly" against an employer, but rather to give them a "fair reading." 138 S.Ct. at 1142 (noting that courts have "no license to give the exemption anything but a fair reading.").

A fair reading of the HCE exemption supports the conclusion that annualization need not be cabined to the first and last dates that an individual ever worked for an employer. Importantly, the nature of Greinstein's project-based role as an EHS Specialist afforded him the opportunity to go weeks and even months without performing any work for FieldCore while he was between projects. "When Retainer B employees are not working for FieldCore, they may be working for another employer or on their own, or they may be eligible for unemployment benefits." (ECF 196-1 at App. 0059 [Abel Decl. ¶ 6].) Greinstein himself testified that "[i]t's possible" he "might have worked for another employer" when he was not working for FieldCore "during the period August 2016 through September 2017." (Reply App. 0018 [Greinstein Dep. 156:19-24].) Other Plaintiffs file for and receive unemployment whenever they are home and not working on a project for FieldCore. (*See, e.g.*, Reply App. 0053 [Jackson Dep. 28:9-19].)

Under these circumstances, calculating annualized earnings by looking at the number of weeks worked, as opposed to the first and last dates they ever worked with weeks and months off in between, is consistent with the Supreme Court's directive that the exemptions be given "a fair reading." 138 S.Ct. at 1142.

## V.    PLAINTIFFS CANNOT SUSTAIN THEIR BURDEN OF ESTABLISHING THAT FIELDCORE WILLFULLY VIOLATED THE FLSA

It is not FieldCore's burden to prove that it did not willfully violate the FLSA. It is Plaintiffs' burden to prove that it did—and it's a burden that they ignore. Indeed, through discovery, Plaintiffs did not produce a single document or piece of information in response to FieldCore's requests for production and interrogatories seeking anything relevant to Plaintiffs'

claim that it willfully violated the law. That's because they have none. "One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims," like Plaintiffs' claim of willfulness. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

Plaintiffs argue that it is not their burden to prove willfulness at this stage in the litigation; and that they need merely to establish a disputed material fact. To avoid summary judgment on an issue "where the nonmoving party will bear the burden of proof at trial," however, requires that the nonmoving party (in this case Plaintiffs) "designate "*specific facts* showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. 324 (emphasis added). But they can point to no fact at all that would establish that FieldCore knowingly and recklessly violated the FLSA.

Quite the contrary, the decades-worth of clear authority—going back to 1965, at least— comprising rulings from multiple U.S. Courts of Appeals and also declarative opinions from the U.S. Department of Labor's Wage and Hour Division Administrator, discussed *supra*, establish that Plaintiffs are attempting to upend foundational principles of employee pay law. FieldCore's pay practices are reasonable *at worst* given the breadth of authority that includes *Acs*, *Anani*, *Lintz*, *Helix*, and even *Trottier*, among others.

No reasonable jury sitting in this Court and hearing the facts of this case would conclude that FieldCore knowingly and recklessly violated the law. FieldCore paid Greinstein and each plaintiff who joined his litigation just as it promised it would when they signed their offer letters, accepting employment in these crucial roles. Plaintiffs do not and cannot dispute that those offer letters clearly provided that FieldCore would pay them: (1) a handsome, predetermined weekly salary in each week that they worked (even if they worked fewer than 40 hours); and (2) additional compensation for any hours worked in excess of 40 in a week. Plaintiffs' authority-

21

and reality-defying claims boil down to a contention that FieldCore's plan would have been just fine if it included only the first part, but it became illegal when FieldCore offered the potential for additional pay in the second part. FieldCore did not violate the law by fulfilling its promise to pay Plaintiffs just as it committed that it would do. It certainly did not do so willfully.

## CONCLUSION

FieldCore has established the elements proving that, given a fair reading of the FLSA's exemptions for *bona fide* administrative and professional employees, Plaintiff Greinstein, and each party plaintiff, cannot recover allegedly unpaid overtime in this case. No reasonable juror would conclude otherwise. And even if one could, no jury could find that FieldCore willfully withheld that pay from the employees it classified as exempt under the highly compensated employee exemption, the administrative exemption, and the professional exemption. This Court should enter judgment in FieldCore's favor on all claims in this case.

Date: February 14, 2023                                  Respectfully submitted,

Kelly D. Utsinger                                        s/ *Brett C. Bartlett*
Texas Bar No. 20416500                                   Brett C. Bartlett*
kelly.utsinger@uwlaw.com                                 Georgia Bar No. 040510
UNDERWOOD LAW FIRM, P.C.                                  bbartlett@seyfarth.com
500 S. Taylor, Suite 1200 LB 233                         Kevin M. Young*
Amarillo, Texas 79101                                    Georgia Bar No. 183770
Tel: (806) 376-5613                                      kyoung@seyfarth.com
Fax: (806) 379-0316                                      Zheyao Li
                                                         Texas Bar No. 24096419
                                                         yaoli@seyfarth.com
                                                         SEYFARTH SHAW LLP
                                                         1075 Peachtree Street, N.E., Suite 2500
                                                         Atlanta, Georgia 30309-3958
                                                         Telephone: (404) 885-1500
                                                         Facsimile: (404) 892-7056

                                                         Theresa M. Waugh*
                                                         Florida Bar No. 89593
                                                         twaugh@seyfarth.com
                                                         975 F Street, N.W.
                                                         Washington, DC 20004

Telephone: (202) 828-3586
Facsimile: (202) 828-5393

*Admitted pro hac vice*

**Counsel for Defendants Granite Services
International, Inc. and FieldCore Service
Solutions, LLC**

**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION**

HERMAN GREINSTEIN, Individually and
For Others Similarly Situated,

          Plaintiff,

   v.

GRANITE SERVICES INTERNATIONAL,
INC. and FIELDCORE SERVICES
SOLUTIONS, LLC,

         Defendants.

Case No. 2:18-cv-00208-Z-BR

**CERTIFICATE OF SERVICE**

I certify that on February 14, 2023, I filed the foregoing **DEFENDANTS' REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT** with the Clerk of the Court using the ECF system, which will send notification of such filing to the following attorneys of record:

Michael A. Josephson
mjosephson@mybackwages.com
Andrew Dunlap
adunlap@mybackwages.com
Richard M. Schreiber
rschreiber@mybackwages.com
JOSEPHSON DUNLAP, LLP
11 Greenway Plaza, Suite 3050
Houston, Texas 77046

Richard J. (Rex) Burch
rburch@brucknerburch.com
BRUCKNER BURCH, PLLC
8 Greenway Plaza, Suite 1500
Houston, Texas 77046

s/ *Brett C. Bartlett*
One of Counsel for Defendants

91803030v.6