**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
**AMARILLO DIVISION**

| | |
|---|---|
| HERMAN GREINSTEIN, Individually and For Others Similarly Situated,<br><br>        Plaintiff,<br><br>   v.<br><br>GRANITE SERVICES INTERNATIONAL, INC. and FIELDCORE SERVICES SOLUTIONS, LLC,<br><br>        Defendants. | Case No. 2:18-cv-00208-Z-BR |

**DEFENDANTS' BRIEF IN SUPPORT OF**
**RENEWED MOTION FOR SUMMARY JUDGMENT**

**TABLE OF CONTENTS**

**Page**

INTRODUCTION .................................................................................................................. 1

STATEMENT OF UNDISPUTED MATERIAL FACTS .................................................. 3

I.     Plaintiff Greinstein Accepted a Critical Role in Exchange for a Weekly Base Salary of $1,800 Plus Additional Compensation ................................................................ 3

     A.     Greinstein Performed Important, Judgment-Laden, Safety Impacting Job Duties on Large-Scale, Highly Regulated Energy Projects ....................................... 4

     B.     For His Important Work, FieldCore Paid Greinstein as a Highly Compensated, Salaried Employee ...................................................................... 6

II.     FieldCore Requires Highly Skilled, Professional Employees Because it Provides Field Service Solutions to Customers in the Power Generation, Oil & Gas, Nuclear, and Wind Power Markets ................................................................................................ 7

III.     EHS Specialists Oversee Safety and Regulatory Compliance on Projects .......................... 7

IV.     FieldCore Pays EHS Specialists a Competitive Weekly Salary and Has Safeguards to Ensure the Salary is Paid Appropriately ................................................................. 9

V.     FieldCore Employees Have Several Ways to Address Any Concerns Regarding Pay ....... 11

VI.     The Other Plaintiffs Performed Important Duties, Received a Weekly Salary, and Were Well Paid ........................................................................................................... 12

     A.     Four Opt-In Plaintiffs Earned More Than Enough to Be Exempt Under the Highly Compensated Employee Exemption Each Year of Their Employment ................................................................................................... 12

          1.     Eric Farmer ............................................................................... 12

          2.     Antonio Flores ........................................................................... 13

          3.     Stephen Jones ............................................................................ 13

          4.     Byron White ............................................................................... 14

     B.     The Remaining Opt-In Plaintiffs Also Received Handsome Salaries, High Compensation, and Performed Duties That Justify Exemption .......................... 15

          1.     Kathleen Cancienne .................................................................. 15

          2.     Edwin Collazo ........................................................................... 16

          3.     Ray Hightower ........................................................................... 16

          4.     Jesse Jackson, Sr. ...................................................................... 17

          5.     Calvin Oberndorfer .................................................................. 17

          6.     Adilson Quintela ....................................................................... 18

|     | 7. | Culton Speer ....................................................................................... | 18 |
| | 8. | Matthew Starr ..................................................................................... | 19 |
| | 9. | Altonia Williams ................................................................................. | 20 |

ARGUMENT & LEGAL AUTHORITY ................................................................................. 20

I.      Legal Standard ............................................................................................................. 20

II.     The FLSA Wasn't Intended to Protect Highly Paid Employees Like Greinstein ................ 21

III.    The FLSA's Exemptions Must Be Construed Fairly, Not Narrowly and Not Against
        an Employer .................................................................................................................. 21

IV.     Greinstein's Claims Fail Because He is Exempt from the FLSA's Overtime
        Requirements Pursuant to Multiple Exemptions ......................................................... 22

        A.    Greinstein Satisfies the Administrative Exemption ............................................. 22

              1.    FieldCore Paid Greinstein on a Salary Basis at a Level Nearly
                    Quadruple the Minimum Requirement for Exempt Status ......................... 23

              2.    Greinstein's Duties Satisfy the FLSA's Administrative Exemption ........... 26

        B.    Greinstein Also Satisfies the Professional Exemption ......................................... 30

        C.    Greinstein Was Exempt Due to the Nature of His Combined Exempt
              Duties .................................................................................................................. 32

        D.    Greinstein Also Satisfies the Highly Compensated Employee Exemption ............ 32

              1.    Greinstein Satisfies the HCE Exemption's Compensation
                    Requirements Because He Received a Salary Well in Excess of
                    $455/Week and His Annualized Compensation Exceeded $100,000 .......... 33

        E.    Greinstein Also Satisfies the HCE Exemption's Duties Test ................................ 34

V.      The Other Plaintiffs Also Satisfy a Combination of the Administrative,
        Professional, and Highly Compensated Employee Exemptions .................................... 36

VI.     Greinstein's Arguments Regarding the "Reasonable Relationship" Test and a
        Single Workweek in Which He Was Paid Less than $1,800 Fall Flat ............................. 37

        A.    The "Reasonable Relationship" Doesn't Apply to Employees Like
              Greinstein Who Are Paid a Weekly Base Salary .................................................. 37

        B.    FieldCore Didn't Make Improper Deductions From Greinstein's Salary .............. 42

VII.    In the Alternative, the FLSA Precludes a Regulation That Requires Overtime Pay
        for an Employee Working in an Executive, Administrative, or Professional
        Capacity Based Solely on How Their Pay is Computed ................................................ 45

VIII.   Greinstein Cannot Establish Any Violation of the FLSA, Let Alone a "Willful"
        One ............................................................................................................................... 47

CONCLUSION .................................................................................................................... 49

-ii-

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Abramo v. City of New York*,
  54 F. App'x 708 (2d Cir. 2003) ...........................................................................44

*ACS v. Detroit Edison Co.*,
  444 F.3d 763 (6th Cir. 2006) ..............................................................................24

*Allen v. Coil Tubing Servs., L.L.C.*,
  846 F. Supp. 2d 678 (S.D. Tex. 2012) ...............................................................35

*Amendola v. Bristol-Myers Squibb Co.*,
  558 F. Supp. 2d 459 (S.D.N.Y. 2008)................................................................34

*Anani v. CVS RX Servs., Inc.*,
  730 F.3d 146 (2d Cir. 2013)......................................................................24, 25, 40

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986)...........................................................................................20, 21

*Ballard v. Dover Wipes Co.*,
  2015 U.S. Dist. LEXIS 57830 (D. De. May 4, 2015) .........................................28

*Bell v. Callaway Partners, LLC*,
  2010 WL 6231196 (N.D. Ga. 2010) ....................................................................25

*Bell v. Callaway Partners, LLC*,
  394 F. App'x 632 (11th Cir. 2010) ................................................................24, 25

*Boykin v. Boeing Co.*,
  128 F.3d 1279 (9th Cir. 1997) ............................................................................24

*Brooklyn Sav. Bank v. O'Neil*,
  324 U.S. 697 (1945)............................................................................................21

*Brown v. Aleris Specification Alloys, Inc.*,
  2016 WL 1183207 (N.D. Ind. 2016)...................................................................42

*Carranza v. Red River Oilfield Servs., LLC*,
  No. H-15-3631, 2017 WL 387196 (S.D. Tex. Jan. 27, 2017)..............................35

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986)............................................................................................20

*Chakir v. BA Rsch. Int'l, LP,*
    2011 WL 13248862 (S.D. Tex. 2011) ...................................................................41

*Christopher v. SmithKline Beecham Corp.,*
    567 U.S. 142 (2012)......................................................................................21, 45, 46

*Coates v. Dassault Falcon Jet Corp.,*
    961 F.3d 1039 (8th Cir. 2020) ...............................................................................25, 45

*Dalheim v. KDFW-TV,*
    918 F.2d 1220 (5th Cir. 1990) .....................................................................................32

*E.M.D. Sales, Inc. v. Carrera,*
    604 U.S. 45 (2025)........................................................................................................22

*Encino Motorcars, LLC v. Navarro,*
    584 U.S. 79 (2018)...........................................................................................22, 34, 45

*Escribano v. Travis Cty., Texas,*
    947 F.3d 265 (5th Cir. 2020) ......................................................................................44

*Fife v. Harmon,*
    171 F.3d 1173 (8th Cir. 1999) ....................................................................................24

*Gentry v. Hamilton-Ryker IT Sols., L.L.C.,*
    102 F.4th 712 (5th Cir. 2024) ...............................................................................40, 41

*Greinstein v. Granite Servs. Int'l, Inc.,*
    2023 WL 3264049 (N.D. Tex. May 4, 2023), *report and recommendation
    adopted,* 2023 WL 3933079 (N.D. Tex. June 9, 2023), *motion to certify appeal
    granted,* 2023 WL 5167606 (N.D. Tex. June 28, 2023), and *rev'd and remanded
    on other grounds,* 2024 WL 3771455 (5th Cir. Aug. 13, 2024).........................2, 49

*Haas v. Behr Dayton Thermal Prod., LLC,*
    2008 WL 11351383 (S.D. Ohio 2008)........................................................................42

*Hebert v. FMC Techs., Inc.,*
    2023 WL 4105427 (5th Cir. 2023) .............................................................................38

*Helix Energy Sols. Grp., Inc. v. Hewitt,*
    598 U.S. 39 (2023).............................................................................................. *passim*

*Hernandez v. Homesley,*
    No. 11-cv-1268, 2013 WL 124102 (N.D. Tex. Jan. 10, 2013)................................47

*Hewitt v. Helix Energy Sols. Grp., Inc.,*
    15 F.4th 289 (5th Cir. 2021) (*en banc*) ...................................................................40

*Huggins v. U.S.*,
    2005 WL 6112625 (Fed. Cl. 2005)........................................................................47

*Jones v. New Orleans Reg'l Physician Hosp. Org., Inc.*,
    981 F.3d 428 (5th Cir. 2020) .............................................................................44

*King v. Stevenson Beer Distrib. Co.*,
    11 F. Supp. 3d 772 (S.D. Tex. 2014) ...................................................................32

*Kitty Hawk Air Cargo, Inc. v. Chao*,
    304 F. Supp. 2d 897 (N.D. Tex. 2004) ................................................................30

*Levine v. Unity Health Sys.*,
    847 F. Supp. 2d 507 (W.D.N.Y. 2012) ................................................................25

*Little v. Liquid Air Corp.*,
    37 F.3d 1069 (5th Cir. 1994) .............................................................................21

*Litz v. Saint Consulting Group, Inc.*,
    772 F.3d 1 (1st Cir. 2014).................................................................................40

*Loper Bright Enterprises v. Raimondo*,
    603 U.S. 369 (2024)........................................................................................45

*Lott v. Howard Wilson Chrysler-Plymouth, Inc.*,
    203 F.3d 326 (5th Cir. 2000) .............................................................................26

*Martinez v. Hilton Hotels Corp.*,
    930 F. Supp. 2d 508 (S.D.N.Y. 2013)..................................................................25

*McLaughlin v. Richland Shoe Co.*,
    486 U.S. 128 (1988)........................................................................................47

*Nevada v. U.S. Dep't of Labor*,
    218 F. Supp. 3d 520 (E.D. Tex. 2016)..................................................................46

*Owsley v. San Antonio Indep. Sch. Dist.*,
    187 F.3d 521 (5th Cir. 1999) .............................................................................31

*Paul v. Petroleum Equip. Tools Co.*,
    708 F.2d 168 (5th Cir. 1983) .............................................................................31

*Pickens v. Hamilton-Ryker IT Sols., LLC*,
    133 F.4th 575 (6th Cir. 2025) ......................................................................40, 41

*Pruneda v. Xtreme Drilling & Coil Servs., Inc.*,
    No. 16-CV-19, 2017 WL 3023214 (W.D. Tex. June 20, 2017) ...............................35

*Rindfleisch v. Gentiva Health Servs., Inc.*,
    962 F. Supp. 2d 1310 (N.D. Ga. 2013) ................................................................41

*Schaefer v. Indiana Michigan Power Co.*,
    358 F.3d 394 (6th Cir. 2004) .................................................................................28

*Schreckenbach v. Tenaris Coiled Tubes, LLC*,
    No. 11-CV-4065, 2013 WL 178126. (S.D. Tex. Jan 16, 2013)...............................48

*Smith v. Ochsner Health Sys.*,
    956 F.3d 681 (5th Cir. 2020) .................................................................................34

*Sonnier v. Recon Mgmt. Servs. Inc.*,
    No. 20-CV-02, 2022 WL 141779 (W.D. La. Jan. 14, 2022) ..................................48

*Texas v. U.S. DOL*,
    2024 WL 4806268 (E.D. Tex. 2024) .....................................................................46

*Total E & P USA Inc. v. Kerr-McGee Oil and Gas Corp.*,
    719 F.3d 424 (5th Cir. 2013) .................................................................................20

*Trottier v. FieldCore Servs. Sols., LLC*,
    2022 WL 658765 (N.D. Tex. Mar. 4, 2022) .................................................. *passim*

*Venable v. Smith Int'l, Inc.*,
    117 F.4th 295 (5th Cir. 2024) ...............................................................................38

*Wilson v. Schlumberger Tech. Corp.*,
    80 F.4th 1170 (10th Cir. 2023) ..............................................................................37

*Zannikos v. Oil Inspections (U.S.A.), Inc.*,
    605 F. App'x. 349 (5th Cir. 2015) .............................................................21, 35, 47

**Statutes**

29 U.S.C. § 202...................................................................................................................21

29 U.S.C. § 207(a) .................................................................................................3, 21, 46

29 U.S.C. § 216(b) .......................................................................................................3, 4

29 U.S.C. § 255(a) ...............................................................................................................47

**Other Authorities**

29 C.F.R. § 541.3(a) ...........................................................................................................26

29 C.F.R. § 541.102 ............................................................................................................34

29 C.F.R. § 541.200(a).................................................................................................22, 26

29 C.F.R. § 541.201(b) ..................................................................................................34, 35

29 C.F.R. § 541.202 ................................................................................................29, 30, 34

29 C.F.R. § 541.203(c) ....................................................................................................34

29 C.F.R. § 541.301 ..........................................................................................................30

29 C.F.R. § 541.600 ....................................................................................................24, 39

29 C.F.R. § 541.601 ..............................................................3, 21, 26, 27, 32, 33, 34

29 C.F.R. § 541.602 ..........................................................................23, 24, 33, 43

29 C.F.R. §541.603 ........................................................................................44, 45

29 C.F.R. § 541.604 ......................................................................2, 24, 37, 38

29 C.F.R. § 541.700(a) ..................................................................................26, 34

29 C.F.R. § 541.708 ........................................................................................32

29 C.F.R. § 604(a) ..........................................................................2, 40, 41, 49

Fed. R. Civ. P. 56(a) ........................................................................................20

Fed. R. Civ. P. 56(c) ..................................................................................20, 49

## INTRODUCTION

Plaintiff Herman Greinstein alleges that he was not paid a salary, that he was an hourly employee, and that he was misclassified as exempt under the Fair Labor Standards Act of 1938 ("FLSA"), 29 U.S.C. § 201, *et seq*. Discovery has shown each of these allegations to be false, and Plaintiff's claims fail as a matter of law.

Greinstein worked for Defendants Granite Services International, Inc. ("Granite") and FieldCore Service Solutions, LLC ("FieldCore")[1] for a total of 31 weeks across 2016 and 2017. Greinstein was a highly-trained, highly-compensated Environmental, Health, and Safety (EHS) Specialist.[2] For his 31 weeks of work, he received $84,771.00—far in excess of $100,000 on an annualized basis—including a predetermined weekly salary of $1,800 that he agreed to in writing when he accepted FieldCore's offer of employment in 2016.

Greinstein's true complaint is that he was paid too much—that, instead of merely paying his promised salary of $1,800 per week, FieldCore somehow rendered him a nonexempt, hourly employee by paying him an additional $45 per hour for any hours worked in excess of 40 in a week. But FieldCore didn't pay him too much or too little, it paid Greinstein exactly what it promised and Greinstein accepted, and it paid him in compliance with the laws and regulations that he now claims FieldCore violated.

Greinstein cannot dispute the fact of the predetermined amount he was paid on a weekly basis. It's described precisely in the offer letter he signed when he accepted FieldCore's offer of

---

[1] In April 2017, Granite converted to an LLC and changed its name to FieldCore Service Solutions International LLC. In August 2017, that entity transferred its U.S. operations and employees to Defendant FieldCore. (App. 0001-0002 ¶¶ 2-3 [Scott Decl.].) In this briefing, for simplicity, both Defendants are referred to as "FieldCore."

[2] Granite referred to Greinstein's role as EHS Manager. FieldCore referred to his role as EHS Site Safety Professional or Site Safety Specialist. (App. 0010 ¶ 5 [Peeples Decl.]; App. 0002 ¶ 5 [Scott Decl.].) Defendants use the term EHS Specialist in this brief.

employment, which read: "While in this exempt position, **you will be paid on a salary basis. In any week that you perform work for the company, you will be paid a weekly salary at the rate of $1,800.00 per week, regardless of the number of hours (up to 40) worked in the week.**"

Greinstein also cannot dispute the fact that he performed quintessentially exempt duties. He described these duties proudly (and, he admits, accurately) in his résumés, which portray him as a sophisticated, prudent, and experienced safety manager; he testified to these exempt duties by declaration submitted to the Court in this case; and he summarized them in his responses to written discovery as including the primary job duties of ensuring compliance with FieldCore's and its clients' safety training, policies, and procedures. These irrefutable facts alone establish his *bona fide* exempt status under the FLSA and warrant the entry of judgment on his claims.

Greinstein's attempt to circumvent this fatal conclusion warrants no serious consideration. He complains that, in a nutshell, even if he otherwise might have been classified properly as exempt, FieldCore undid his exempt status by paying him too much—it offered him a premium on top of his weekly salary of $1,800 that, according to him, violated a so-called "reasonable-relationship test" of 29 C.F.R. § 541.604(b), because the ratio of his total compensation compared to his weekly salary was too great. But as this Court has already correctly ruled, '[t]he relevant provision for the purposes of this case is § 541.604(a) because it is applicable to employees paid on a weekly basis, like Greinstein and the other Plaintiffs, in contrast to § 541.604(b), which is applicable to workers paid on 'an hourly, a daily or a shift basis.'"[3] Similarly, this Court correctly held in the related *Trottier*

---

[3] *Greinstein v. Granite Servs. Int'l, Inc.*, 2023 WL 3264049, at *3 (N.D. Tex. May 4, 2023), *report and recommendation adopted*, 2023 WL 3933079 (N.D. Tex. June 9, 2023), *motion to certify appeal granted*, 2023 WL 5167606 (N.D. Tex. June 28, 2023), and *rev'd and remanded on other grounds*, 2024 WL 3771455 (5th Cir. Aug. 13, 2024). Previously, this Court denied summary judgment solely on the basis that § 604(a) required payment even for weeks in which employees performed no work. The Fifth Circuit reversed this Court's decision solely on that basis, expressly declining to consider Greinstein's reasonable relationship argument as an alternative ground for affirmance. *Greinstein*, 2024 WL 3771455, at *2.

-2-

litigation, "[a]s for any 'reasonable-relationship test' argument . . . the test is of no consequence" when an employee is paid on a weekly basis.[4]

Accordingly, under the FLSA and its regulations, because FieldCore paid Greinstein a weekly salary that vastly exceeded the Act's salary level threshold, and because his primary duties were exempt, FieldCore classified him properly as a *bona fide* exempt employee under 29 U.S.C. § 213(a)(1). And if there were any question that his primary duties were not exempt (which there is not), FieldCore nevertheless classified him properly under the highly compensated employee exemption set forth in 29 C.F.R. § 541.601. This Court should enter summary judgment on Greinstein's claims.

The Court need not stop there, however, as similar grounds exist to enter judgment on the claims of each individual who has opted into this litigation as a party plaintiff under 29 U.S.C. § 216(b). Lastly, to the extent any Plaintiff's claim survives judgment on the whole, the Court should enter summary judgment on Greinstein's claim that FieldCore willfully violated the FLSA, as he can proffer no evidence that FieldCore knowingly or recklessly violated the law, if it were determined to have committed any violation at all.

## STATEMENT OF UNDISPUTED MATERIAL FACTS[5]

### I.    Plaintiff Greinstein Accepted a Critical Role in Exchange for a Weekly Base Salary of $1,800 Plus Additional Compensation

On August 24, 2016, Plaintiff Greinstein, whose "word is his bond,"[6] executed his acceptance of FieldCore's offer of "a position with Granite Services International, Inc. (GSII) as a/an Manager effective August 22, 2016." (App. 0017 [offer leter].) In that "exempt position," Greinstein would be paid on "a salary basis" at "the rate of $1,800 per week, regardless of the

---

[4] *Trottier v. FieldCore Servs. Sols., LLC*, 2022 WL 658765, at *7 (N.D. Tex. Mar. 4, 2022).

[5] Pursuant to LR 56.6, citations to "App. __" refer to Defendants' continuously-paginated Appendix.

[6] App. 0040 [Greinstein Dep. 117:11].

number of hours [up to 40] worked in the week." (*Id.*) He would also, in addition to that weekly salary, be paid "$45.00 per hour for all hours worked over 40 in a work week." (*Id.*) In exchange for this base weekly salary plus additional compensation, Greinstein's job, according to his own testimony, "was to ensure compliance with environment, health, and safety factors, programs, and procedures of Defendants and the government" and *ultimately* "to prevent onsite accidents," by conducting "facility and site inspections, dealing with regulatory agencies, assessing risks, and conducing training based on Defendants' policies and procedures." (App. 0039 [Greinstein Dep. 116:13-25].)

These and other undisputed material facts establish that Plaintiff Greinstein was a mission-critical professional, management-level employee whom FieldCore paid a handsome salary *plus* additional compensation for the work that he performed.

### A.    Greinstein Performed Important, Judgment-Laden, Safety Impacting Job Duties on Large-Scale, Highly Regulated Energy Projects

Plaintiff Greinstein began working for Granite on August 22, 2016 as an EHS Specialist. (App. 0004-0005 [Scott Decl. ¶ 16].) In August 2017, his employment was transferred to FieldCore, where he remained employed until September 22, 2017, when he resigned. (*Id.*) Greinstein resided in Florida and traveled to projects across the country where he was assigned for varying lengths of time. (App. 0005 [Scott Decl. ¶ 17].) Greinstein also had long stretches—weeks, even months at a time—when he was not assigned to any project and didn't do any work for FieldCore. (*Id.*)

As an EHS Specialist, Greinstein administered a complex safety program in the field. His primary duties included: helping drive the implementation of FieldCore standards and procedures onsite; managing the process by which all site personnel and employees were informed of safe working procedures and practices so that they could fulfill their responsibilities; managing required compliance activities, including the implementation of safety regulations and FieldCore EHS programs; investigating incidents or "near miss" events, including compilation and completion of

any necessary documentation; analyzing root causes to determine safety measures to prevent future incidents and influence the implementation of corrective actions; conducting appropriate inspections and audits and monitoring and documenting corrective actions; completing required EHS reports; developing, compiling, and maintaining the EHS project plan; communicating, coordinating, and administering EHS training as needed, including new employee orientation; promoting medical preparedness; assisting in safety risk assessment; driving compliance with EHS policy, local regulations, and chemical management programs; communicating regular updates regarding injury and illness awareness and mitigating measures; conducting internal audits and providing recommendations to improve audit performance; establishing good rapport with site personnel, other contractors, and customers; and managing documentation related to EHS initiatives, ad hoc programs, and safety stand downs. (App. 0049-0053 [Greinstein Dep. 134:22-25; 135:1-25; 136:1-25; 137:1-25; 138:1-3].) Greinstein admits that he performed every duty that FieldCore and its customers expected of him, as outlined in FieldCore's description of his job.[7] (App. 0050-0054 [Greinstein Dep. 135-139].)

Greinstein relied on his training, education, and experience to be able to perform these various duties. He was a member of the American Society of Safety Engineers. (App. 0030 [Greinstein Dep. 60].) He has advanced OSHA training, equivalent to an OSHA 500 or OSHA 510 today. (App. 0031-0032 [Greinstein Dep. 61-62].) He is an expert regarding OSHA standards and regulations. (App. 0019-0020 [Greinstein Dep. 23-24].) He relied on the knowledge gained from his training and experience to understand which of the complex and myriad OSHA standards governed various situations and "how to apply them when you see it in the field." (App. 0021-0027, 0032

---

[7] These included many requiring—self-evidently—the exercise of discretion and judgment. Others did, as well. For example, an important part of Greinstein's job was to identify at-risk behavior and respond appropriately, including by knowing when to raise such behavior with the Site Manager. (App. 0027-0028 [Greinstein Dep. 42-44].)

[Greinstein Dep. 36-41; 62].)

      **B.**    **For His Important Work, FieldCore Paid Greinstein as a Highly Compensated, Salaried Employee**

Greinstein's annualized compensation, inclusive of his $93,600 annual salary that FieldCore paid him on a weekly basis, was $131,641.47 in 2016 and $126,468.21 in 2017.[8] He received his agreed-to $1,800 weekly amount every single week that he worked. (*See* App. 0070-0135.) In almost every week that he worked, he received substantially more.[9] (*Id.*)

      There is one week, however, that Greinstein claims should require this Court to conclude that he *was not* a highly compensated, salaried employee. Out of all of his paychecks spanning his employment in 2016 and 2017, there is one for which he was paid for a full, 8-hour day, but nothing more. Greinstein remembers *nothing* about that day or the week in which it sat. (App. 0041-0042 [Greinstein Dep. 125-26].) He does not know where he was. (App. 0042-0043 [Greinstein Dep. 126-27].) He does not know which day it was. (App. 0044 [Greinstein Dep. 128] ("No, I don't remember it was a Monday either.").) He *guesses* he must have been driving all day, but doesn't know from where. (App. 0042-0043 [Greinstein Dep. 126-27].) On the other days of that week, he might have been riding motorcycles, playing with his grandkids, washing or fixing his car, or working for another employer. (App. 0044-0048, 0055-0056 [Greinstein Dep. 128-132, 153-154].) He doesn't know. But he *claims* he worked that day, "demobilizing" from a prior project. (App. 0042

---

[8] In 2016, the year Greinstein began his employment with Granite, he worked a total of 12 weeks, for which he was compensated in the amount of $30,378.80. (App. 0136 [W-2 Box 1].) In 2017, the last year of Greinstein's employment with Defendants, he worked a total of 21 weeks, for which he was compensated in the amount of $51,073.70. (App. 0141, 0148 [Greinstein was issued two W-2 Forms, by two different FieldCore entities, for 2017].) Greinstein's 2016 earnings (*i.e.*, $30,378.80) are annualized by dividing them by the number of weeks in which he performed worked in 2016 (*i.e.*, 12) and multiplying that result by 52. A similar calculation is used for annualizing his 2017 earnings.

[9] Defendants paid Greinstein his full weekly salary even when he worked less than a full week. For example, during the week ending August 20, 2017, Greinstein worked two days, for a total of 16 hours. (App. 0062-0066 [Timesheet].) He nevertheless received his full weekly salary of $1,800 for that workweek. (App. 0069 [Paystub].)

[Greinstein Dep. 126].) In truth, that singular 8-hour pay event was the result of Greinstein incorrectly recording his time. (App. 0154 ¶ 4 [Johnson Decl.) Regardless, he never complained that he was paid improperly for that week.[10] (App. 0154 ¶ 8 [Johnson Decl.].)

## II.    FieldCore Requires Highly Skilled, Professional Employees Because it Provides Field Service Solutions to Customers in the Power Generation, Oil & Gas, Nuclear, and Wind Power Markets

FieldCore (and Granite before it) provides qualified teams of professionals delivering highly tailored field service solutions to its customers in the power generation, oil and gas, nuclear, and renewable energy markets (*e.g.*, wind, solar, hydro). (App. 0009 ¶ 3.) [Decl. of James "Rod" Peeples] Among other things, FieldCore provides total plant solutions for field services, installation, maintenance, and upgrades or repowers across plant configurations, including wind, hydro, aeroderivative gas turbine, heavy duty gas turbine, steam turbine nuclear, and steam turbine coal. (App. 0002 ¶ 4 [Decl. of Michael Scott].[11])

The markets in which FieldCore provides services are highly regulated and require the expertise of highly skilled EHS professionals who use their education, experience, training, and judgment to make varied important decisions in the best interest of FieldCore and its clients. (App. 0010 ¶ 7 [Peeples Decl.]; App. 0002-0003 ¶ 8 [Scott Decl.].)

## III.    EHS Specialists Oversee Safety and Regulatory Compliance on Projects

The EHS group is dedicated to guarding the safety and regulatory compliance of operations, machinery, and personnel on projects of all sizes at plants and facilities across the country. (App. 0010 ¶ 4 [Peeples Decl.].) FieldCore employees face potentially lethal risks when working on and

---

[10] Greinstein never talked to anyone in Defendants' payroll department about the way he was paid. (App. 0057 [Greinstein Dep. 173:5-7].)

[11] Defendants reference the Declaration of Michael Scott, which they first filed in response to Plaintiff's original motion for conditional certification. The Court granted Plaintiff's motion to strike Paragraphs 21, 23, and 25 of the Scott Declaration (ECF Nos. 58, 81); Defendants do not rely on those paragraphs herein.

around power-generating turbines. As Greinstein has testified, a violation of a safety protocol may result in an employee "lying dead on the ground." (App. 0027 [Greinstein Dep. 42].) The presence of highly-trained EHS professionals is crucial to worker safety. To that end, EHS Specialists are highly skilled professionals who fulfill critically important roles at the project sites to which they are assigned. (App. 0011 ¶ 11 [Peeples Decl.].)

Each EHS Specialist has a specific focus, *e.g.*, wind, nuclear, or hydro, and are typically staffed on assignments that align with their skillset, with some EHS Specialists being cross trained across different groups. (*Id.*; App. 0003 ¶¶ 9-10. [Scott Decl.]) EHS Specialists must possess vast knowledge of safety and regulatory requirements in their respective focus area, and many have a NEBOSH National General Certificate or equivalent specialized certifications. (App. 0011-0012 ¶ 12; App. 0003 ¶ 11 [Peeples Decl. ¶ 12; Scott Decl. ¶ 11].)

Most projects include a single Site Manager, who is typically (but not always) an employee of FieldCore's client, and an EHS Specialist, who is a FieldCore employee with primary responsibility for administering he onsite health and safety program. (App. 0010-0011, 0012 ¶¶ 8, 14 [Peeples Decl.].) At a high level, the EHS Specialist works onsite at an assigned project and is responsible for overseeing the safety and well-being of the people and property at the site. (App. 0012 ¶ 13 [Peeples Decl.].) Their actual day-to-day responsibilities include, among other duties, coordinating EHS onsite audits and inspections, assessing risks, investigating incidents, conducting safety training, and interfacing with regulatory agencies. (*Id.*) In carrying out these duties, EHS Specialists develop and execute project plans, draft incident and audit reports, oversee site operations, and develop recommendations to help make sure that safety incidents aren't repeated and that compliance gaps are quickly resolved. (*Id.*) All of this consistent with how Greinstein describes his role while Defendants' employee in 2016 and 2017. (*See supra.*)

-8-

**IV.** **FieldCore Pays EHS Specialists a Competitive Weekly Salary and Has Safeguards to Ensure the Salary is Paid Appropriately**

Because of the importance of their work, EHS Specialists are consistently paid well in excess of the minimum weekly salary for exempt employees ($455 per week until 2020, and $684 per week thereafter) in any week in which they perform work, regardless of the number of hours worked. (*See, e.g.*, App. 0017, 0170-0196 [Offer letters].)

FieldCore pays almost all of its EHS Specialists according to one of two compensation plans. One plan, as noted above, is the Retainer Plus Benefits plan, more commonly referred to as "Retainer-B" or "RET-B." The other is the Retainer plan, sometimes referred to as the "V1" plan. (App. 0059 ¶ 5 [Abel Decl.].) The V1 plan was at issue in the related *Trottier* litigation, while RET-B is at issue in this case.

Both plans—RET-B and V1—provide for the payment of (i) a predetermined weekly amount that does not change based on the amount of hours worked or quality of the work performed; and (ii) premium pay based on excess hours worked. The RET-B plan provides for payment of an employee's predetermined weekly salary for any week in which the employee performs any work, regardless of the number of hours worked, plus premium pay for each hour worked in excess of 40 in a week. (App. 0059 ¶ 6 [Abel Decl.].) The RET-B plan further provides certain benefits, such as healthcare, even when employees are not working for FieldCore. (App. 0157-0158 [Abel 30(b)(6) Dep. 26].)

Out of all the weeks Greinstein and the other Plaintiffs worked, he points to just one in which he received less than his agreed-to $1,800 weekly salary, as described in Section I.B., *supra*. None of the other Plaintiffs have identified a single week in which they worked at all and were paid less than their full weekly salary. To the contrary, there are numerous examples where they worked fewer than 40 hours in a week and still received their full weekly salary. For instance, Ray Hightower worked 2 hours in the week ending June 21, 2020, and he still received his full weekly

salary. (*See* App. 1280-1281 [Supplemental Appendix filed contemporaneously with *Helix* supp. brief].) Hightower worked 8 hours in the week ending August 11, 2019, and 16 hours in the week ending June 2, 2019, and for both weeks received his full weekly salary. (*Id*.) Antonio Flores worked 8 hours in the weeks ending August 25, 2019 and December 1, 2019, and received his full salary for both weeks. (*Id*.) Eric Farmer worked 8 hours in the week ending September 22, 2019, and received his full salary. (*Id*.) Calvin Oberndorfer worked 6 hours in the week ending February 10, 2019, and received his full salary. (*Id*.) Byron White worked 8 hours in the week ending February 10, 2019, and received his full salary. (*Id*.) The list goes on. (*See, e.g.*, *id*.)

The V1 plan similarly provides for payment of a predetermined salary each week (the only difference being it includes weeks when no work is performed), and additionally provides premium pay for each hour worked in excess of a certain number of hours for the year, which varies by employee (*e.g.*, 1,500 or 1,750 hours). (App. 0059 ¶ 5 [Abel Decl.].) In *Trottier*, this Court recognized that the "reasonable relationship" test does not apply to the V1 plan due to the predetermined weekly salary the plan offers. *Trottier*, 2022 WL 658765, at *7.

Since FieldCore's inception in 2017, its policy has always been to comply with all U.S. wage and hour laws, including that all salaried employees should receive their predetermined weekly salary each week that they perform work in accordance with the FLSA. (App. 0159 [Abel 30(b)(6) Dep. 66].) Consistent with that policy, FieldCore works with its payroll processor to ensure that the payroll system is properly programed to generate paychecks that always include at least an employee's full salary. (App. 0159-0160 [Abel 30(b)(6) Dep. 66-67].) In other words, there are systematic, software-based safeguards in place such that employees on the RET-B plan receive their full predetermined weekly salary for each week in which they perform any work for FieldCore. (App. 0160 [Abel 30(b)(6) Dep. 62].) This policy was reduced to writing in 2019 and became known as the U.S. Wage Compliance Policy, but the document simply reflected FieldCore's preexisting

-10-

policy—it did not change how the RET-B compensation plan worked or how it was administered. (App. 0161-0162 [Abel 30(b)(6) Dep. 72-73]; App. 165 [Johnson 30(b)(6) Dep. 64].)

FieldCore's U.S. Wage Compliance Policy reiterates its policy "to compensate employees accurately and to do so in compliance with all applicable state and federal laws." (App. 0166 [Wage Compliance Policy].) The policy emphasizes the importance of having accurate records, making sure that employees know not to "over-report or under-report hours worked." (*Id.*). For exempt employees, the policy states, in accordance with FieldCore's historical practice, that they "will receive a *salary* that is intended to compensate them for all hours worked for the Company in a given workweek, regardless of how many or how few hours were actually worked." (App. 0167 (emphasis added).) The policy goes on to affirm that "the salary is a fixed amount that will not be subject to deductions for variations in the quantity or quality of the work performed." (App. 0167.)

## V.     FieldCore Employees Have Several Ways to Address Any Concerns Regarding Pay

FieldCore recognizes that sometimes mistakes in payments can happen. Consequently, FieldCore reminds employees that they have several options if they believe a mistake has been made in the payment of their wages. (App. 0168 [Wage Compliance Policy].) For example, "[i]f employees believe their pay has been subject to any improper deductions or does not accurately reflect the total hours worked, the employees should immediately report the matter to their manager or Human Resources Manager." (*Id.*) Alternatively, employees can "escalate the issue to their 1-over-1 manager, or any manager in the Company with whom the employees feel comfortable discussing the issue." (App. 0168-0169.) Additionally, employees can report their concern via email or by completing a form "using the desktop link." (App. 0169.) Employees can also connect directly with the Payroll department should they have questions. (App. 163 [Abel 30(b)(6) Dep. 133].)

Regardless of how an employee chooses to raise a concern regarding pay, "[a]ny inadvertent deductions or pay mistakes will be promptly corrected, and the Company will make a good faith

commitment to comply in the future." (App. 0169 [Wage Compliance Policy 4].)

Prior to FieldCore's existence, Granite followed the same policy, although payroll processing was a manual rather than automated process. (App. 0154 ¶ 6 [Johnson Decl.].) Granite employees who were compensated under the RET-B plan, such as Plaintiff Herman Greinstein, were required to record at least 40 hours each week on their time sheets. (App. 0153-0154 ¶ 3 [Johnson Decl.]. But not all of those hours needed to be working time. For example, if an employee performed only 32 hours of actual work, he was required to enter the 32 hours of work time, plus 8 hours of unproductive time, so that he would be paid the weekly salary. (*Id.*) Like FieldCore, Granite employees could raise any concerns regarding pay with their supervisors or with the Payroll department. (App. 0154 ¶ 8 [Johnson Decl.].)

## VI.    <u>The Other Plaintiffs Performed Important Duties, Received a Weekly Salary, and Were Well Paid</u>

The Opt-In Plaintiffs who have joined this case also worked in the EHS Specialist role, performed incredibly important duties onsite at large-scale projects, received a weekly salary far in excess of the FLSA's minimum required salary for exempt employees, and, in several cases, earned well above the total compensation threshold for the FLSA's HCE exemption.

### A.    Four Opt-In Plaintiffs Earned More Than Enough to Be Exempt Under the Highly Compensated Employee Exemption Each Year of Their Employment

#### 1.    *Eric Farmer*

Plaintiff Eric Farmer worked for FieldCore in 2019 and 2020. He received a weekly salary of $1,920 under the RET-B plan for any workweek in which he performed work, plus premium pay when he exceeded 40 hours worked in a week. (App. 0185 [Offer letter].) He received $50,989.58 over 21 weeks in 2019 (which annualizes to $126,259.91) (App. 1267-1277 [Pay Register]; App. 0262 [W-2 Box 1]), and he received $117,772.06 in 2020. (App. 0268 [W-2 Box 1].)

Farmer was responsible for determining whether workers onsite were following important

policies and being safe, including evaluating whether they were wearing the correct personal protective equipment and reporting incidents. (App. 0260 [Farmer Dep. 105].) Part of Farmer's job was creating a good safety culture and getting people to buy-in to that safety culture. (App. 0258 [Farmer Dep. 14].) He was responsible for monitoring anywhere from 15 to 50 people on a new construction project, and 150 to 300 people on a repower project. (App. 0261 [Farmer Dep. 106].) He also acted as a mentor to a new EHS Specialist, showing him how to set up the site "and the general running of the site day to day." (App. 0259 [Farmer Dep. 37].)

### 2. *Antonio Flores*

Plaintiff Antonio Flores worked for FieldCore in 2018 and 2019. He was guaranteed a weekly salary of $2,000 under the RET-B plan for any workweek in which he performed any work, plus premium pay when he exceeded 40 hours in a week. (App. 0174 [Offer letter].) He received $56,134.24 over 19 weeks in 2018 (which annualizes to $153,630.55) (App. 0318- [Paystubs]; App. 0348 [W-2 Box 1]), and he received $141,934.78 in 2019. (App. 0354 [W-2 Box 1].)

As part of his job as an EHS Specialist, Flores was trained in developing risk assessments, on bloodborne pathogens, on how to rescue people on wind turbines, and on dangerous compounds such as hexavalent chromium. (App. 0338-0342 [Flores Dep. 160-164].) He investigated safety incidents and near-miss events, including taking witness and injured party statements, and conducted inspections and audits, reporting on anything he found amiss. (App. 0343-0344 [Flores Dep. 165-66].) Flores was responsible for observing and reporting compliance with EHS policies, local regulations, and OSHA regulations. (App. 0345-0346 [Flores Dep. 167-68].) And as a liaison to the client, it was important for White to have strong customer service skills. (App. 0364-0347 [Flores Dep. 168-69].)

### 3. *Stephen Jones*

Plaintiff Stephen Jones worked for FieldCore in 2019. He received a predetermined weekly

salary of $1,840 under the RET-B plan for any workweek in which he performed any work, plus premium pay when he exceeded 40 hours worked in a week. (App. 0170 [Offer letter].) Jones received $15,409.96 over five weeks in 2019 (which annualizes to $160,263.58). (App. 0359-0363 [Paystubs]; App. 0370 [W-2 Box 1].)

Among other credentials core to his job, Jones possessed a HAZWOPER certification and an OSHA 30 certification. (App. 0365-0366 [Jones Dep. 40-41 ].) Jones was responsible for day-to-day safety oversight. (App. 0369 [Jones Dep. 123].) He felt it was his important responsibility to oversee personnel to ensure they did not become complacent about safety, and to prevent their focus on production from being detrimental to safety needs and standards. (App. 0367-0368 [Jones Dep. 120-121 ].)

### 4. *Byron White*

Plaintiff Byron White worked for FieldCore in 2019. He was guaranteed a weekly salary of $1,840 under the RET-B plan for any workweek in which he performed work, plus premium pay when he exceeded 40 hours worked in a week. (App. 0172 [Offer letter].) White received $101,292.05 in 2019 (when the HCE threshold was $100,000). (App. 424 [W-2 Box 1].)

White had about 15 years of safety experience before starting at FieldCore, as well as construction experience and project management experience, all of which helped him perform his job for FieldCore. (App. 0418 [White Dep. 27].) Among other qualifications, White possessed OSHA 10, 30, 510, and 500 certifications. (App. 0422-0423 [White Dep. 55-56 ].) White's job was to determine whether workers were adhering to relevant safety rules, regulations, policies, and procedures. (App. 0419-0420 [White Dep. 40-41].) He had the authority to stop work if he thought someone or something at the site created a serious health or safety risk. (App. 0420-0421 [White Dep. 41-42].)

**B.     The Remaining Opt-In Plaintiffs Also Received Handsome Salaries, High Compensation, and Performed Duties That Justify Exemption**

In addition to the individual Opt-In Plaintiffs discussed above, other Opt-In Plaintiffs sometimes, but not always, received enough compensation in a year to be considered a highly compensated employee. Whether they surpassed that threshold or not, each of them was paid a predetermined weekly salary well in excess of $455 per week (and, as of January 2020, $684 per week)—the minimum for exempt employees—and performed exempt duties as EHS Specialists.

**1.     *Kathleen Cancienne***

Plaintiff Kathleen Cancienne worked for FieldCore in 2019 and 2020. She was guaranteed a weekly salary of $1,355.77 under the V-1 compensation plan. (App. 0181 [Offer letter]; App. 0461 [Paystub].)[12] Cancienne received additional compensation at a rate of $47 per hour, on top of her weekly salary, for each hour she worked in a year above 1,500. (App. 0181 [Offer letter].)

Cancienne possessed a number of certifications, including OSHA 500 and OSHA 510, a certification in being able to identify issues with scaffolding, CPR certifications, different certifications for working in refineries, and EM 385 certification, which is a safety certificate needed to work with the Army Corps of Engineers. (App. 0497-0498 [Cancienne Dep. 14-15; 18-19].) As an EHS Specialist, Cancienne was responsible for being the eyes and ears for paying attention to safety details that would otherwise get overlooked. (App. 0501 [Cancienne Dep. 20].) She performed risk analysis, doing a daily walkthrough of the project and giving her analysis to the project manager. (App. 0502 [Cancienne Dep. 35].) Cancienne described her job as "a lot like being a lawyer." (App. 0503 [Cancienne Dep. 76].) To do job correctly, "[y]ou've got to do your schoolwork. And there are some people who don't just use books, there's also the OSHA website that stays updated with new laws and regulations that they implement.· And it's all about keeping

---

[12] Toward the end of her tenure at FieldCore, Cancienne moved to the RET-B plan, but was only paid under that plan for one pay period. (*See* App. 0432-0495 [Paystubs] (with only App. 0463 showing RET-B pay).)

your company abreast, because everything is always changing." (App. 0503-0504 [Cancienne Dep. 76-77].)

### 2. *Edwin Collazo*

Plaintiff Edwin Collazo worked for FieldCore in 2018 and 2019. He received a predetermined weekly salary of $2,000 under the RET-B plan for any workweek in which he performed work, plus premium pay when he exceeded 40 hours worked in a week. (App. 0183 [Offer letter].)

Collazo felt his work was important from a personal health and injury standpoint, as well as from a business perspective. (App. 0524 [Collazo Dep. 52].) For example, his job was to not only avoid the downtime of losing production, but more importantly, to oversee site safety with the overarching goal that "everybody gets to go home" at the end of the day: "It's very important that no one gets hurt on a job site." (App. 0523 [Collazo Dep. 51].) To that end, Collazo conducted safety trainings for onsite personnel, focusing on topics such as how to properly utilize safety equipment and how to do a self-rescue. (App. 0522 [Collazo Dep. 39].)

### 3. *Ray Hightower*

Plaintiff Ray Hightower began working for FieldCore in 2016 and transitioned to the RET-B plan in 2017. He was guaranteed a weekly salary of $1,471.20 under the V1 plan, plus premium pay when he exceeded 1,500 billable hours for the year. (App. 001290 [Offer letter].) He subsequently moved to the RET-B plan with a guaranteed weekly of $1,519.70 for any workweek in which he performed work, plus premium pay when he exceeded 40 hours worked in a week. (App. 001291 [Offer letter].)

Hightower testified that his primary duty "as a site safety professional" was to "supervise" and "make sure that the personnel on site are, number one, following OSHA guidelines and all those sorts of things." (App. 001284 [Hightower Dep. 20:3-9].) He described his day-to-day job as "[t]o

observe and monitor all conditions on the site regarding safety," including adherence to "OSHA standards, GE's standards, or the specific site, the customer's standards." (App. 001285-1286 [Hightower Dep. 28:22-29:21].) Hightower had the discretion to exercise his stop-work authority if he observed imminent danger, and to intervene and coach the offending individual. (App. 001287 [Hightower Dep. 31:3-13].) Hightower considered his job to be "very important." (App. 001283 [Hightower Dep. 19:16-24].) He mentioned that, having "witnessed several industrial incidents/injuries" impacted his desire to embrace and prioritize safety. (App. 001283 [Hightower Dep. 19:9-15].)

### 4. *Jesse Jackson, Sr.*

Plaintiff Jesse Jackson, Sr. is an active FieldCore employee who was first hired in 2013. He receives a predetermined weekly amount of $1,600 under the RET-B plan for any workweek in which he performs work, plus premium pay when he exceeds 40 hours in a week. (App. 0178 [Offer letter].)

Jackson testified that his primary duty was to administer the EHS program so that people adhered to EHS policies and procedures. (App. 0727-0728 [Jackson Dep. 38-39].) It was important for him to understand what the work crews were doing each day so that he could to decide which safety procedures to emphasize. (App. 0732 [Jackson Dep. 74].) Jackson testified that his years of experience working on wind sites, including as a site manager, helped him to identify hazards and to know how and what to communicate to the workers. (App. 0729 [Jackson Dep. 43; 67-68].) He also acted as a mentor to newer employees. (App. 0730 [Jackson Dep. 67].)

### 5. *Calvin Oberndorfer*

Plaintiff Calvin Oberndorfer worked for FieldCore until 2022. He was guaranteed a predetermined weekly salary of $1,680 under the RET-B plan for any week in which he performed work, plus premium pay when he exceeded 40 hours in a week. (App. 0194 [Offer letter].)

Oberndorfer was responsible for administering compliance with FieldCore's safety program, which included getting individuals to take safety seriously while working "in a very risky business." (App. 0734-0735 [Oberndorfer Dep. 33-34].) He possessed OSHA 500 and OSHA 510 training, and climb and rescue training. As part of his job, Oberndorfer reviewed work plans and make recommendations as needed, which differed from project to project. (App. 0736-0737 [Oberndorfer Dep. 63-64].)

### 6.     *Adilson Quintela*

Plaintiff Adilson Quintela worked for FieldCore until 2019. He was guaranteed a weekly salary of $1,730.40 under the RET-B plan for any workweek in which he performed work, plus premium pay when he exceeded 40 hours worked in a week. (App. 0195 [Offer letter].)

As an EHS Specialist for FieldCore, Quintela undertook numerous trainings and certifications, including risk assessment and scaffolding training, hazard recognition, lockout/tagout, and temperature awareness. (App. 0802-0807 [Quintela Dep. 71-76].) To properly do his job, Quintela had to know all the various hazards involved with power production, including gasses and electrical. (App. 0804-0805 [Quintela Dep. 73-74].) He was responsible for, among other things, administering compliance with federal, state, and local laws; conducting onsite reviews and audits of operations; and giving daily safety talks to mechanics, supervisors, and sometimes field engineers. (App. 0803; 0808-0812 [Quintela Dep. 72; 168-172].)

### 7.     *Culton Speer*

Plaintiff Culton Speer worked for FieldCore from 2018 until 2022. He was guaranteed a weekly salary of $1,326.92 under the V-1 compensation plan, plus premium pay when he exceeded 1,500 billable hours for the year. (App. 1278 [Offer letter].) He subsequently moved to the RET-B plan with a guaranteed weekly of $1,870.80 for any workweek in which he performed work. (App. 0927 [Paystub].)

Speer was responsible for administering the safety program and GE wind-specific procedures and evaluating whether onsite personnel were meeting those requirements. (App. 1028-1029 [Speer Dep. 22-23].) His duties included: "[e]valuate and identify safety issues affecting field operations at the site"; "assist in developing solutions working hand in hand with all management and the other EHS representatives and managers"; "[p]rovide employees with feedback to ensure compliance with OSHA, MSHA, local municipalities, state, government and GE policies and procedures"; "[m]onitor health hazards periodically"; "[o]rganize, collect and keep up to date all required EHS Records"; "[c]onduct daily safety trainings and meetings"; "[i]dentify and evaluate environmental issues affecting the sites"; "[c]onstantly utilizing strong hazard recognition skills"; "[e]nsuring environmental compliance with EPA and DOT hazardous materials and waste standards"; and "[i]dentifying, reporting, and mitigating workplace hazards and unsafe conditions." (App. 1029A - 1030 [Speer Dep. 100-102] (testifying his Indeed resume was accurate); App. App. 1031 [Resume].)

### 8. *Matthew Starr*

Plaintiff Matthew Starr worked for FieldCore from 2019 until 2021. He was guaranteed a weekly salary of $2,000 under the RET-B plan for any workweek in which he performed work, plus premium pay when he exceeded 40 hours worked in a week. (App. 0190 [Offer letter].)

Starr managed and supervised field personnel to achieve compliance with EHS policies, procedures and legislative standards. (App. 1210 [Starr Dep. 45].) He believed it was important to have good judgment as an EHS Specialist in order to be able to deal with different people, including knowing how to coach them. (App. 1211 [Starr Dep. 47].) He "need[ed] to be able to look at any given work situation and determine which standards you need to apply to make sure that it's safe." (App. 1211-1212 [Starr Dep. 47-48].)

9.    *Altonia Williams*

Plaintiff Altonia Williams worked for FieldCore until 2019. He was guaranteed a weekly salary of $1,269.23 under the V1 plan, plus premium pay when he exceeded 1,500 billable hours for the year. (App. 0179 [Offer letter].) He subsequently moved to the RET-B plan with a guaranteed weekly of $1,760 for any workweek in which he performed work. (App. 1248 [Paystub].)

Williams brought with him to the EHS Specialist job five years of safety experience from the Marine Corps, in addition to experience as an operations manager at FEMA. (App. 1260-1261 [Williams Dep. 30-31].) Those experiences helped him be able to coordinate safety at FieldCore, helping to make sure that people were able to do their jobs properly from a compliance and safety perspective. (App. 1260-1261 [Williams Dep. 30-31].) As Williams concedes, it was very important to have an EHS professional such as Williams on site under OSHA and state laws; if not, "that's when death comes up." (App. 1262-1263 [Williams Dep. 101-102].)

## ARGUMENT & LEGAL AUTHORITY

### I.  Legal Standard

Summary judgment is appropriate if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 330 (1986). A fact is "material" only if it affects the lawsuit's outcome. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is genuine only "if the evidence is such that a reasonable jury could return a verdict for the nonmov[ant]." *Id*. While courts must view the evidence in the light most favorable to the non-moving party, an actual controversy exists only "when both parties have submitted evidence of contradictory facts." *Total E & P USA Inc. v. Kerr-McGee Oil and Gas Corp*., 719 F.3d 424, 434 (5th Cir. 2013).

Under Rule 56(c), it's the movant's burden to "inform[] the district court of the basis for its motion, and identify[] those portions of [the record] which it believes demonstrate the absence of a

genuine issue of material fact." *Celotex Corp.*, 477 U.S. at 323. To rebut a properly supported motion for summary judgment, the nonmovant must show, with "significant probative evidence," that a genuine issue of material fact exists. *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994). "If the evidence is merely colorable, or is not significantly probative,' summary judgment is appropriate." *Anderson*, 477 U.S. 242 at 249.

## II.     The FLSA Wasn't Intended to Protect Highly Paid Employees Like Greinstein

Enacted during the Great Depression in 1938, the FLSA established minimum labor standards in order to eliminate "labor conditions detrimental to the maintenance of the minimum standard of living necessary for health, efficiency, and general well-being of workers." 29 U.S.C. § 202. The statute was designed to "aid the unprotected, unorganized, and lowest paid of the nation's working population; that is, those employees who lacked sufficient bargaining power to secure for themselves a minimum subsistence wage." *Brooklyn Sav. Bank v. O'Neil*, 324 U.S. 697, 706, n.18 (1945); *cf. Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 166 (2012) (noting that salespeople earning an average of $70,000 per year "are hardly the kind of employees that the FLSA was intended to protect"). Accordingly, the Act provides exemptions to the overtime requirements for individuals employed in a *bona fide* administrative, professional, or executive capacity, *see* 29 U.S.C. § 213(a)(1), and the U.S. Department of Labor ("DOL") has recognized that "a high level of compensation is a strong indicator of an employee's exempt status," *see* 29 C.F.R. § 541.601(c).

## III.    The FLSA's Exemptions Must Be Construed Fairly, Not Narrowly and Not Against an Employer

The FLSA requires employers to pay overtime to covered employees who work more than 40 hours in a week, except it exempts from its overtime requirements any "employee employed in a bona fide executive, administrative, or professional capacity . . . ." 29 U.S.C. §§ 207(a), 213(a)(1). Summary judgment is appropriate when the employer demonstrates that there's no question that one of the exemptions applies. *See Zannikos v. Oil Inspections (U.S.A.), Inc.*, 605 F. App'x. 349 (5th

Cir. 2015) (affirming district court's granting motion for summary judgement to employer because plaintiffs (inspectors) were exempt).

Until 2018, many courts labored under the impression that exemptions must be construed narrowly and against an employer. The Supreme Court eradicated that view in 2018 when it ruled that "[b]ecause the FLSA gives no 'textual indication' that its exemptions should be construed narrowly, 'there is no reason to give [them] anything other than a fair (rather than a 'narrow') interpretation.'" *Encino Motorcars, LLC v. Navarro*, 584 U.S. 79, 88 (2018). The Supreme Court continued down this path earlier this year, when, in an unanimous opinion, it resolved a circuit split to hold that the preponderance-of-the-evidence standard—not a heightened standard—governs whether an employee is exempt from overtime under the FLSA. *E.M.D. Sales, Inc. v. Carrera*, 604 U.S. 45, 52 (2025). Simply stated, exemptions are not to be construed narrowly, nor are employers subject to a heightened proof standard in demonstrating their application.

## IV.    Greinstein's Claims Fail Because He is Exempt from the FLSA's Overtime Requirements Pursuant to Multiple Exemptions

Under a straightforward, fair reading of the FLSA and its exemptions, Greinstein's compensation and duties as an EHS Specialist place him squarely within one or more exemptions, including the administrative and professional exemptions (or the combination exemption), as well as the highly compensated employee ("HCE") exemption. His claims thus fail as a matter of law.

### A.    Greinstein Satisfies the Administrative Exemption

An employee falls within the administrative exemption if: (1) he is paid on a salary basis of at least $455 per week (or, as of January 1, 2020, $684 per week); and (2) his primary duty (a) is the performance of non-manual work, (b) is directly related to the management or general business operations of his employer or its customer, and (c) includes the exercise of discretion and independent judgment with respect to matters of significance. 29 C.F.R. § 541.200(a). The record evidence reveals no genuine dispute of material fact as to these requirements.

### 1.    FieldCore Paid Greinstein on a Salary Basis at a Level Nearly Quadruple the Minimum Requirement for Exempt Status

It's beyond reasonable dispute that FieldCore paid Greinstein on a salary basis at a level of at least $455 per week. In fact, his weekly salary of $1,800 was nearly four times the minimum threshold. FieldCore easily satisfies the administrative exemption's salary requirements.

Section 541.602(a) of DOL's FLSA regulations instructs that an employee is paid on a salary basis if he "regularly receives each pay period on a weekly, or less frequent basis, a predetermined amount constituting all or part of the employee's compensation, which amount is not subject to reduction because of variations in the quality or quantity of work." 29 C.F.R. § 541.602(a).

The compensation plan under which Greinstein was paid plainly met the salary basis test and was FLSA compliant. Despite Greinstein's bald claim that he "was an hourly . . . employee" (ECF No. 87 ¶¶ 4, 9), the evidence shows that he was a salaried employee who received a predetermined weekly salary of $1,800 every week in which he performed any work, with the exception of one week (discussed in Section VI.B, *infra*). Greinstein received his salary each week in which he performed any work, whether he worked 40 hours or 1 hour, and regardless of the quality of his work. (App 0070-0135 [Paystubs].) As noted above, there were several weeks in which Greinstein worked less than 40 hours and was still paid his full weekly salary.[13]

The fact that Greinstein received hourly-based premium pay in addition to his guaranteed weekly salary does not alter the salary basis calculus. In addition to noting that the salary may constitute "all or part of the employee's compensation," the FLSA's salary basis regulations provide that "[a]n employer may provide an exempt employee with additional compensation without losing the exemption or violating the salary basis requirement, if the employment arrangement also

---

[13] For example, during the week ending August 20, 2017, Greinstein worked two days, for a total of 16 hours. (App. 0062-0066 [Timesheet].) He was still paid his full weekly salary of $1,800 for that week. (App. 0068 [Paystub].)

includes a guarantee of at least the minimum weekly-required amount paid on a salary basis." *See* 29 C.F.R. § 541.604(a). This includes "additional compensation based on hours worked," including on the basis of a "straight-time hourly amount." *Id.*[14]

Simply stated, the fact that FieldCore paid Greinstein an hourly premium for work in excess of 40 hours per week doesn't change the fact that he was paid on a salary basis. Consistent with the letter of the FLSA regulations, numerous courts have endorsed exempt employee compensation plans consisting of both a salary and additional compensation.

The Second Circuit's decision in *Anani v. CVS RX Servs., Inc.*, 730 F.3d 146 (2d Cir. 2013), is directly on point. In *Anani*, the employee, a pharmacist, was paid a guaranteed weekly base salary exceeding $1,250, "based on a forty-four hour work week." *Id.* at 147. He "also received additional compensation because he invariably, or almost so, worked hours in addition to the base forty-four hours each week." *Id.* The "additional hours worked usually ranged from 16 to 36 hours per week," and for those hours he was paid extra compensation "according to an hourly" rate. *Id.* The court held that because the employee's "base salary substantially exceeded $455 per week and there were no impermissible deductions," and was "to be paid regardless of the number of hours [the employee] actually worked in a given forty-four-hour shift," the "requirements of C.F.R. §§ 541.600 and 541.602 are thus satisfied with regard to the minimum guaranteed weekly amount being paid 'on a salary basis.'" *Id.* at 148.

The Eleventh Circuit's decision in *Bell v. Callaway Partners, LLC*, 394 F. App'x 632 (11th

---

[14] Consistent with these regulations, numerous other courts have also endorsed exempt employee compensation plans consisting of both a salary and additional compensation. *See, e.g.*, *ACS v. Detroit Edison Co.*, 444 F.3d 763, 768 (6th Cir. 2006) ("That Detroit Edison chooses to pay what it terms 'straight-time' overtime compensation—in other words, additional compensation at the exempt employee's 'hourly' rate for hours worked beyond 40 in a work week—does not violate the salary-basis test."); *Fife v. Harmon*, 171 F.3d 1173, 1175 (8th Cir. 1999) (an employee is paid on a salary basis if there is a predetermined amount of compensation plus hourly overtime payments for work worked in excess of 40 hours per week); *Boykin v. Boeing Co.*, 128 F.3d 1279, 1281-82 (9th Cir. 1997) ("overtime compensation," including on hourly basis, "does not spoil exempt status").

Cir. 2010), is similarly instructive. In *Bell*, "Plaintiffs received a guaranteed weekly salary of $1600 or more . . ." plus "additional incentive compensation (a 'bonus') paid at a straight-time hourly rate based on the cumulative number of billable hours that Plaintiffs worked" above 40 in a week. 394 F. App'x 632, 633 (11th Cir. 2010). And, like here, the pay plan in Bell stated that for weeks when "no work is performed, salary will not be paid." *Bell v. Callaway Partners, LLC*, 2010 WL 6231196, at *2 (N.D. Ga. 2010). Even so, the Eleventh Circuit affirmed the district court's grant of summary judgment to the employer, finding that the pay plan did not violate the "requirements of the salary basis test." *Bell*, 394 F. App'x at 634.

The salary basis determination remains unchanged even if paystubs purport to show hourly pay: "An employer using an hourly-based payroll system may be entitled to summary judgment if there is no evidence of an actual practice of reducing the guaranteed minimum salary of exempt employees, and undisputed evidence shows that no exempt employee was paid less than this amount." *Coates v. Dassault Falcon Jet Corp.*, 961 F.3d 1039, 1045 (8th Cir. 2020). There, the Eighth Circuit explained that so long as the employer's pay plan guaranteed a predetermined amount not subject to reduction based on quality or quantity of work performed, it didn't matter how much the method of compensation resembled payroll procedures for a typical hourly wage-earner: *Id.* at 1045; *see also Martinez v. Hilton Hotels Corp.*, 930 F. Supp. 2d 508, 523 (S.D.N.Y. 2013) ("[C]ourts generally have rejected the proposition that an employer's reference to hourly rates in payroll statements affects an employee's status as a salaried employee."); *Levine v. Unity Health Sys.*, 847 F. Supp. 2d 507, 509-10 (W.D.N.Y. 2012) (holding that "references to an 'hourly rate' in its payroll statements" aren't relevant because "the focus of the FLSA, and this Court's inquiry, is whether the plaintiffs were actually paid on a salary or hourly basis, and not how they may have interpreted their employer's contemporaneous use of 'salary' and 'hours' terminology").

No different than the exempt plaintiffs in *Anani*, *Coates*, and *Bell*, Greinstein was plainly

paid on a salary basis at a level far above the minimum. That he received premium pay for hours in excess of 40 per week doesn't change this. As a matter of law, Greinstein satisfies the administrative exemption's salary level and salary basis requirements.

### 2. Greinstein's Duties Satisfy the FLSA's Administrative Exemption

Greinstein readily satisfies the administrative exemption's duties' requirements as well. These requirements necessitate that (i) Greinstein's primary duty was the performance of non-manual work (ii) directly related to the management or general business operations of FieldCore or its customer, and (iii) his primary duty included the exercise of discretion and independent judgment with respect to matters of significance. These requirements are readily satisfied.

#### a. *Greinstein's Primary Duty Was the Performance of Office or Non-Manual Work*

The record evidence confirms that Greinstein's primary, or most important, duty was the performance of office or non-manual work. *See* 29 C.F.R. § 541.200(a).

The "primary duty" is "the principal, main, major, or most important duty that the employee performs." 29 C.F.R. § 541.700(a). "Factors to consider when determining the primary duty of an employee include, but are not limited to, the relative importance of the exempt duties as compared with other types of duties; the amount of time spent performing exempt work; the employee's relative freedom from direct supervision; and the relationship between the employee's salary and the wages paid to other employees for the kind of nonexempt work performed by the employee." *Id.*; *see Lott v. Howard Wilson Chrysler-Plymouth, Inc.,* 203 F.3d 326, 331 (5th Cir. 2000) ("primary duty" is flexible concept). Manual work (as opposed to office or non-manual work), in turn, refers to "work involving repetitive operations with their hands, physical skill and energy." 29 C.F.R. § 541.3(a).

Greinstein's primary duty, in his own words, "was to ensure compliance with environment, health, and safety factors, programs and procedures of Defendants and the government." (App. 0039

[Greinstein Dep. 116] (affirming truth and accuracy of his signed declaration).) His "ultimate job duty," Greinstein has testified, "was to prevent onsite accidents. This included facility and site inspections, dealing with regulatory agencies, assessing risks, and conducting training based on Defendants' policies and procedures." (*Id.*)

This work is hardly manual in nature. Rather, Greinstein's job required him to use his training and experience to manage compliance with safety programs, assess conditions at the sites he oversaw, investigate critical safety situations, and the like. His primary job duty required him to think, to exercise judgment, and to manage important processes. Among other things, Greinstein was responsible for the following important duties, all of them non-manual in nature:

- Helping to drive the implementation of FieldCore standards and procedures onsite. (App. 0050 [Greinstein Dep. 135])

- Managing the process by which all site personnel and employees were informed of safe working procedures and practices so that they could fulfill their responsibilities. (App. 0050 [Greinstein Dep. 135])

- Managing required compliance activities, including the implementation of safety regulations and FieldCore EHS programs. (App. 0050 [Greinstein Dep. 135])

- Investigating incidents or "near miss" events. (App. 0050 [Greinstein Dep. 135])

- Analyzing root causes to determine safety measures to prevent future incidents and influence the implementation of corrective actions. (App. 0050-0051 [Greinstein Dep. 135-136])

- Conducting appropriate inspections and audits and ensuring corrective actions were monitored and documented. (App. 0051 [Greinstein Dep. 136])

- Monitoring proper fall protection to prevent death. (App. 0027 [Greinstein Dep. 42])

- Conferring with the site manager if he saw anything dangerous or improper based on his training and experience. (App. 0033-0034 [Greinstein Dep. 68-69])

- Developing, compiling, and maintaining the EHS project plan. (App. 0054 [Greinstein Dep. 139])

If these types of duties aren't non-manual duties, it would be difficult to surmise what qualifies. Greinstein satisfies the first duties requirement of the administrative exemption. *See, e.g.,*

*Schaefer v. Indiana Michigan Power Co.*, 358 F.3d 394, 402 (6th Cir. 2004) ("[a]lthough Schaefer [an environmental specialist] spends some of this time inspecting trucks, examining load bracings, inspecting shipping containers, and examining shipping labels, these 'inspection' tasks—even if not performed at his desk—are nonetheless not manual tasks.").

> **b.    *Greinstein's Primary Duty Was Directly Related to the Management or General Business Operations of FieldCore or its Customers***

"To be 'directly related to the management or general business operations' of the employer or its customers means the 'type of work performed by the employee' is 'directly related to assisting with the running and servicing of the business,' as distinguished, for example, from working on a manufacturing production line.'" *Ballard v. Dover Wipes Co.*, 2015 U.S. Dist. LEXIS 57830, at *15-16 (D. De. May 4, 2015) (quoting 29 C.F.R. § 541.201(a), and citing *Swartz v. Windstream Communc'ns, Inc.*, 429 F. App'x. 102, 104-05 (3d Cir. 2011)). The regulations expressly recognize that "[s]uch work 'includes, but is not limited to, work in functional areas such as . . . safety and health; personnel management . . . ; legal and regulatory compliance; and similar activities.'" *Id.* (quoting 29 C.F.R. § 541.201(b)).

As noted above, Greinstein testified that his job "was to ensure compliance with environment, health, and safety factors, programs and procedures of Defendants and the government." (App. 0039 [Greinstein Dep. 116] (affirming truth and accuracy of his signed declaration).) His "ultimate job duty was to prevent onsite accidents," which included functions like "dealing with regulatory agencies, assessing risks, and conducting training based on Defendants' policies and procedures." (*Id.*)

Again, there can be no serious question that Greinstein's primary duty was directly related to the management or general business operations of FieldCore or the customers, whose sites he manned as an EHS Specialist. As detailed above, Greinstein was paid (handsomely) to use experience, skill, and

judgment to promote safety and avoid hazards for the site and the personnel working there. He admits his primary job was in the area of safety and health and included responsibility for personnel oversight and regulatory compliance. All of this is expressly recognized under the relevant regulations as exemption-satisfying work. Greinstein's duties satisfy the second duties-based requirement of the administrative exemption.

### c.     *Greinstein's Primary Duty Included the Exercise of Discretion and Independent Judgment With Respect to Significant Matters*

Greinstein's primary job function included the exercise of discretion and independent judgment with respect to matters of significance, and he therefore satisfies the third and final duties-based requirement of the administrative exemption.

Exercising discretion and independent judgment "involves the comparison and the evaluation of possible courses of conduct, and acting or making a decision after the various possibilities have been considered." 29 C.F.R. § 541.202(a). Factors affecting this prong of the analysis include "whether the employee has authority to . . . interpret, or implement management policies or operating practices; whether the employee carries out major assignments in conducting the operations of the business; whether the employee performs work that affects business operations to a substantial degree," and "whether the employee investigates and resolves matters of significance on behalf of management." 29 C.F.R. § 541.202(b). Review of decisions by others does not preclude the exemption because the exercise of discretion and independent judgment may consist of recommendations for action, rather than the taking of action directly. *Id.* § 541.202(c).

Greinstein exercised discretion and independent judgment. As noted earlier in this section, his job included implementing FieldCore safety policies and programs, managing safety-related processes and compliance activities, analyzing and investigating safety incidents or "near miss" events, identifying remedial or corrective safety measures, conducting inspections and audits, and

conferring with site management about safety-related issues. Greinstein further testified that he was required to "[e]stablish good rapport with site personnel, other contractors and customers." (App. 0052 [Greinstein Dep. 137].) These functions are squarely in line with the regulatory guidance noted above about what it means to exercise discretion and independent judgment.

The significance of this work is beyond dispute. The term "matters of significance" refers to the level of importance or consequence of the work performed. 29 C.F.R. § 541.202(a). If Greinstein did not properly identify "at-risk behavior," it could "affect the project" if an important piece of equipment is damaged, or someone could get hurt and "never work[] another day in his life," or end up "lying dead on the ground." (App. 0027, 0036-0037 [Greinstein Dep. 42, 81-82].) There are hardly matters more significant than the ones Greinstein was responsible for accounting for every single day that he worked for FieldCore at its clients' sites.

For these reasons, and as detailed above, the undisputed evidence establishes that each element of the administrative exemption applies to Greinstein as an EHS Specialist.

### B.     Greinstein Also Satisfies the Professional Exemption

Though the Court's analysis could stop with the administrative exemption, Greinstein qualifies for exemption under the professional exemption as well. The professional exemption encompasses the same salary basis and level requirements as the administrative exemption, which Greinstein clearly satisfies. He also satisfies the professional exemption's duties' requirements.

An employee falls within the professional exemption if, in addition to meeting its compensation requirements, his primary duty involves the performance of work requiring advanced knowledge, defined as work which is predominantly intellectual in character. 29 C.F.R. § 541.301. The advanced knowledge may be obtained through "specialized academic training" or "through a combination of work experience and intellectual instruction." *Id.* § 541.301(d). "The regulations do not state that the requisite knowledge may be gained only at the college level." *Kitty Hawk Air*

*Cargo, Inc. v. Chao*, 304 F. Supp. 2d 897, 901 (N.D. Tex. 2004) (findings pilots exempt because they "must be trained and certified under FAA regulations"); *see also Owsley v. San Antonio Indep. Sch. Dist.*, 187 F.3d 521, 525 (5th Cir. 1999) (holding that athletic trainers subject to a "fifteen credit-hours" requirement satisfied "the 'learned' prong of the professional exemption"); *Paul v. Petroleum Equip. Tools Co.*, 708 F.2d 168, 172 (5th Cir. 1983) (holding that pilots who have "completed a course of instruction or private study to learn the regulations governing commercial pilots" and "the accident reporting requirements of the National Transportation Safety Board" were exempt under the professional exemption).

Greinstein fits that bill. At a minimum, his job requires a "technical/university degree or qualifying experience or a high school diploma/GED with a minimum of four years of experience in a EHS role." (App. 0053 [Greinstein Dep. 138].) Greinstein himself had even more: he had experience "[g]oing back all the way to 1983." (*Id.*) He also possesses advanced OSHA training, equivalent to an OSHA 500 or OSHA 510. (App. 0031-0032 [Greinstein Dep. 61-62].)[15] As a result of his advanced training and extensive experience, Greinstein is an expert on OSHA standards and regulations. (App. 0019-0020 [Greinstein Dep. 23-24].) These certifications and trainings were key to the job he performed as an EHS Specialist. He relied on the knowledge he gained from his training and decades of experience to understand which of the complex and myriad OSHA standards

---

[15] The Court "may take judicial notice of [agency] regulations establishing the requirements for these licenses." *Paul*, 708 F.2d at 171. The OSHA 500 "course is designed for individuals interested in teaching the 10- and 30-hour construction safety and health Outreach Training Program to their employees and other interested groups." U.S. Department of Labor, Occupational Safety and Health Administration, *Courses by Title and Description*, available at https://www.osha.gov/otiec/courses/title_description. Prerequisites to OSHA 500 include successful completion of OSHA 510 and either "five (5) years of safety and health work experience in the construction industry" or degrees or other certifications plus three years of experience. (*Id.*) The OSHA 500 certification requires a minimum of 26 student hours. (*Id.*) The OSHA 510 "course covers OSHA Standards, policies, and procedures in the construction industry" including scope and application of the OSHA Construction Standards, construction safety and health principles, and special emphasis on those areas in construction which are most hazardous." (*Id.*) The OSHA 510 certification also requires a minimum of 26 student hours. (*Id.*)

governed various situations and "how to apply them when you see it in the field." (App. 0021-0026, 0032 [Greinstein Dep. 36-41; 62].) Greinstein was also a member of the American Society of Safety Engineers until his retirement from the safety profession. (App. 0030 [Greinstein Dep. 60].)

Greinstein's primary duty involved the performance of work requiring advanced knowledge. He gained that experience through myriad certifications and training programs, as well as decades of experience on the job. This suffices to satisfy the professional exemption.

### C.    Greinstein Was Exempt Due to the Nature of His Combined Exempt Duties

Greinstein also qualified for the FLSA's "combination exemption." This exemption applies when an employee's primary duties are a combination of duties for several exemptions, in which case regulations permit employers to "cobbl[e] together" exempt duties from separate exemptions to meet the primary duty test. 29 C.F.R. § 541.708; *King v. Stevenson Beer Distrib. Co.*, 11 F. Supp. 3d 772, 782 (S.D. Tex. 2014); *Dalheim v. KDFW-TV*, 918 F.2d 1220, 1232 (5th Cir. 1990). Thus, even if Greinstein's duties hypothetically didn't fully satisfy the administrative exemption or professional exemption, he is still exempt because, considered all together, his duties qualify for the combination exemption.

### D.    Greinstein Also Satisfies the Highly Compensated Employee Exemption

In addition to satisfying the administrative and professional exemptions, Greinstein satisfies the highly compensated employee, or "HCE," exemption.

The HCE exemption is premised on the notion that "[a] high level of compensation is a strong indicator of an employee's exempt status, thus eliminating the need for a detailed analysis of the employee's job duties." 29 C.F.R. § 541.601(c). Under this exemption, employees earning over $100,000 per year (or $107,432, as of 2020), of which at least $455 per week (or $684, as of 2020) is paid on a salary basis, are exempt provided that they "customarily and regularly" perform "any *one* or more of the exempt duties or responsibilities of an executive, administrative or professional

employee . . . . " 29 C.F.R. §§ 541.601(a) (emphasis added) and 541.601(b)(1).

As set out in the prior section of this brief, there's no question Greinstein performed one or more exempt administrative or professional duties or responsibilities—again, the HCE exemption is far more lenient on the duties front in that performing just one exempt duty, even if it's not the employee's "primary duty," is enough to satisfy the HCE exemption. Nor is there any question, as detailed above, that Greinstein received at least $455 per week paid on a salary basis. The only remaining question the HCE exemption asks is whether Greinstein's total annual compensation exceeded $100,000, and the answer to that is yes as well.

      **1.**    ***Greinstein Satisfies the HCE Exemption's Compensation Requirements Because He Received a Salary Well in Excess of $455/Week and His Annualized Compensation Exceeded $100,000***

In addition to satisfying the salary basis test, to qualify for the HCE exemption, an employee must also earn at least $100,000 of total annual compensation, which may include various forms of nondiscretionary compensation. 29 C.F.R. § 541.602(a). Clearly Greinstein's salary and hourly-based premiums, all paid in accordance with his offer letter, were nondiscretionary.

Where, as here, an employee doesn't work a full year, the total annual compensation requirement is satisfied as long as "the employee receives a pro rata portion" of $100,000 based on the number of weeks he or she was employed. *Id.* at § 541.601(b)(3).

The undisputed record evidence shows that Greinstein satisfied the total compensation requirement, as he earned a prorated amount of well over $100,000 in total annual compensation. During the 21 weeks he worked in 2017, Greinstein was paid a total of $51,073.70, or an average of $2,432.08 per week. (*See supra* at 6 & n.2.) This equates to an annualized amount of $126,468.21. Similarly, for 2016, FieldCore paid Greinstein $30,378.80 for the 12 weeks that he worked, or an average of $2,531.57 per week. (*See id.*) Projected across a full year, this equates to $131,641.47.

There can be no reasonable doubt, reading the FLSA's 13(a)(1) exemptions fairly, that this

high compensation, along with the duties he performed (*see supra*; *infra.*), establishes that Greinstein worked in a *bona fide* exempt capacity while FieldCore employed him. *Encino Motorcars*, 584 U.S. at 89 (noting that courts have "no license to give the exemption anything but a fair reading").

### E.     Greinstein Also Satisfies the HCE Exemption's Duties Test

The HCE exemption does not require a detailed analysis of an employee's job duties. "In crafting the highly compensated employee exemption, the Department of Labor made it easier on both employers and courts. § 541.601(c)." *Smith v. Ochsner Health Sys.*, 956 F.3d 681, 688 (5th Cir. 2020). The Court "need not conduct a particularly 'detailed analysis of the employee's job duties.'" *Id.* The employee's "level of compensation is the principal consideration." *Id.*

The exemption is premised, in fact, on the notion that "[a] high level of compensation is a strong indicator of an employee's exempt status, thus eliminating the need for a detailed analysis of . . . job duties." *See* 29 C.F.R. § 541.601(c). "Among other things, this exemption removes any requirement that an employer prove that an administrative employee exercised discretion in the performance of her duties." *Amendola v. Bristol-Myers Squibb Co.*, 558 F. Supp. 2d 459, 478 (S.D.N.Y. 2008). Thus, the exemption applies "if the employee customarily and regularly performs ***any one*** or more of the exempt duties or responsibilities of an executive, administrative or professional employee," so long as his "primary duty includes performing office or non-manual work." *Id.* at §§ 541.601(c) and (d). "Primary duty" means "the principal, main, major or most important duty that the employee performs . . . . " *Id.* at § 541.700(a).

As detailed above, exempt duties and responsibilities include, among other examples: supervising the work of personnel (29 C.F.R. § 541.102); planning the work of personnel (*id.*); directing or apportioning the work of personnel (*id.*); leading a team to complete a major project (*id.* at § 541.203(c)); work in the area of safety (*id.* at § 541.201(b)); work in the area of regulatory

compliance (*id.*); and work in the area of quality control (*id.*).

As the indisputable record evidence unequivocally shows, Greinstein meets the duty requirement of the HCE exemption. He didn't just perform one of the aforementioned exempt duties; he performed all of them. Supervising and directing personnel are quintessential examples of exempt work, as courts in the Fifth Circuit have recognized. *See, e.g.*, *Carranza v. Red River Oilfield Servs., LLC*, No. H-15-3631, 2017 WL 387196, at *3 (S.D. Tex. Jan. 27, 2017) (holding electromagnetic inspector who managed a pipe inspection crew and ran inspection jobs qualified for the executive and high compensated employee exemptions); *Allen v. Coil Tubing Servs., L.L.C.*, 846 F. Supp. 2d 678, 707 (S.D. Tex. 2012) (holding field service employees who performed managerial responsibilities while in the field completing projects for customers qualified for the executive and high compensated employee exemptions); *Pruneda v. Xtreme Drilling & Coil Servs., Inc.*, No. 16-CV-19, 2017 WL 3023214, at *6 (W.D. Tex. June 20, 2017) (holding that "Service Supervisors" for onshore drilling and coiled tubing services contractor satisfied HCE exemption even though they were "fully engaged in the physical labor" of their crew, including "doing the pump iron and electrical system steps of rig-up").

For example, in *Zannikos v. Oil Inspections (USA), Inc.*, 605 F. App'x 349, 350-51 (5th Cir. 2015), the Fifth Circuit found that the HCE's duties' requirement was satisfied by an Oil Inspector whose responsibilities included "observing oil transfers to verify that performance was accurate, legal, and safe," "monitor[ing] the loading and unloading of cargo," "monitor[ing] and report[ing] on transfers' compliance with . . . safety policies and nationally recognized safety standards," and "perform[ing] quality control functions . . . ." Likewise, in *Carranza*, 2017 WL 387196, at *5, a court granted summary judgment under the HCE exemption to a service provider in the oil & gas industry in a case filed by its former Electro Magnetic Inspector. While the plaintiff presented evidence that he performed work such as driving the crew, setting up for pipe inspections, and

installing testing units, that didn't change the fact that his primary, or most important, function was management, not manual labor.

As an EHS Specialist whose primarily responsibility was supervising field personnel and managing safety programs and, in his own words, "ensur[ing] all employees were acting in accordance with Defendants' and client's training and policies and procedures," Greinstein plainly satisfies the HCE exemption's final prong. His FLSA claims fail accordingly. (App. 0038 A - 0038 B [Greinstein Dep. 111-112].)

**V.    The Other Plaintiffs Also Satisfy a Combination of the Administrative, Professional, and Highly Compensated Employee Exemptions**

As discussed above, at least four Opt-In Plaintiffs (Eric Farmer, Antonio Flores, Stephen Jones, and Byron White) met the salary threshold for the HCE exemption. (*See* Facts Section VI.A, *supra*.) The compensation of the other Plaintiffs (Kathleen Cancienne, Edwin Collazo, Ray Hightower, Jesse Jackson, Sr., Calvin Oberndorfer, Adilson Quintela, Culton Speer, Matthew Starr, and Altonia Williams) did not always meet the HCE threshold. (*See* Facts Section VI.AB, *supra*.) Each of them, however, satisfy the duties requirements of the administrative and professional exemptions.

For example, Famer was responsible for creating the safety culture on site and monitoring the safety of anywhere between 15 to 300 people, depending on the project. (App. 0258, 0261 [Farmer Dep. 14, 106].) Flores investigated safety incidents and near-miss events, including taking witness and injured party statements; conducted inspections and audits; and oversaw compliance with EHS policies, local regulations, and OSHA regulations. (App. 0343-0346 [Flores Dep. 165-68].) Jones stressed his important responsibility to oversee personnel to prevent them from becoming complacent about safety. (App. 0367-0368 [Jones Dep. 120-121].) Cancienne noted the need to keep updated with the always-changing regulatory landscape, describing her job as "a lot like being a lawyer." (App. 0503-0504 [Cancienne Dep. 76-77].) Collazo conduced safety trainings

for site personnel so that "everybody gets to go home" safe and healthy at the end of the day. (App. 0522, 0523 [Collazo Dep. 39, 51].) Jackson used his experience as a former site manager to understand the work being done each day and decide which safety procedures to emphasize. (App. 0729, 0730-0731, 0732 [Jackson Dep. 43, 67-68, 74].) Every Plaintiff testified to ways in which their jobs were important, and required a high level of knowledge and good judgment. (*See generally* Facts Section VI, *supra*.)

Each of these individuals was paid a predetermined amount of at least $684 (or $455 before 2020) in each week that they performed any work for FieldCore, including weeks in which they worked fewer than 40 hours. None of them have identified an improper deduction. As a result, each of the Opt-In Plaintiffs is subject to summary judgment because they were exempt employees under the FLSA.

## VI. Greinstein's Arguments Regarding the "Reasonable Relationship" Test and a Single Workweek in Which He Was Paid Less than $1,800 Fall Flat

### A. The "Reasonable Relationship" Doesn't Apply to Employees Like Greinstein Who Are Paid a Weekly Base Salary

FieldCore anticipates Greinstein will argue, as he has before here and in other cases against FieldCore, that his exempt status is somehow unwound by the application of the "reasonable relationship" test found in 29 C.F.R. § 541.604(b). Not so. As multiple courts have held, the reasonable relationship test "only applies to employees who receive their *base pay*—rather than additional compensation—on an hourly, daily, or shift basis." *Wilson v. Schlumberger Tech. Corp.*, 80 F.4th 1170, 1177 (10th Cir. 2023) (emphasis added). The reasonable relationship test does not apply to compensation plans where the employee receives "a fixed base salary and additional compensation" on an hourly, daily or shift basis. *Id.*; *see also Trottier*, 2022 WL 658765, at *7 (holding that "reasonable-relationship test applies only to an exempt employee whose earnings are 'computed on an hourly, a daily, or a shift basis'").

Read plainly, the test does not apply where, as here, "Defendant pays Plaintiff weekly." *Id.*; *see also Hebert v. FMC Techs., Inc.*, 2023 WL 4105427 (5th Cir. 2023) (holding that if employee is paid a salary plus additional compensation, reasonable relationship test does not apply); *Venable v. Smith Int'l, Inc.*, 117 F.4th 295, 299-300 (5th Cir. 2024) (holding that reasonable relationship test doesn't apply to "a hybrid compensation structure" consisting of a guaranteed component plus "additional day rate paid").

These courts have all recognized that 29 C.F.R. § 541.604(b) clearly states that "[t]he reasonable relationship requirement applies only if the employee's pay is computed on an *hourly, daily or shift basis*," rather than on a salary basis. 29 C.F.R. § 541.604(b) (emphasis added). In its preamble to regulations issued in 2004, the DOL likewise confirmed that the test won't interfere with the exemption calculus for an employee who receives a guaranteed weekly salary.[16] *See also* DOL Opinion Letter FLSA 2020-2, 2020 WL 122924 (Jan. 7, 2020) (noting that when the "*underlying compensation* is not computed on an hourly, daily, or shift basis, the reasonable relationship requirement does not apply") (emphasis added).

As reflected in his offer letter and confirmed by his payroll records, Greinstein was guaranteed and a paid a predetermined weekly amount of $1,800. The reasonable relationship test doesn't apply because his predetermined compensation was paid on a weekly basis, not on an hourly, daily, or shift basis. His predetermined $1,800 weekly salary was not dependent upon, or related in

---

[16] In the preamble, DOL addressed whether the test applies in all cases to employees who receive a salary and additional compensation:

> [T]he salary basis requirement is a valuable and easily applied criterion that is a hallmark of exempt status... We have clarified that this requirement applies only when an employee's actual pay is computed on an hourly, daily or shift basis. Thus, for example, if an employee receives a guaranteed salary plus a commission on each sale or a percentage of the employer's profits, the reasonable relationship requirement does not apply.

*See* Defining and Delimiting the Exemptions for Executive, Administrative, Professional, Outside Sales and Computer Employees, 69 FR 22122-01, 2004 WL 865626, at pg. 22175, 22183 (Apr. 23, 2004).

any way, to the amount of time he worked. Thus, a fair reading of the regulations support the conclusion the reasonable relationship test is inapplicable to Greinstein, who was guaranteed a weekly salary throughout his entire employment. As in *Trottier*, where the Retainer V1 plan had a weekly salary component just like the RET-B plan here, "the [reasonable relationship] test is of no consequence in this case." *Trottier v. FieldCore*, 2022 WL 658765, at *7.

The Supreme Court's decision in *Helix Energy Sols. Grp., Inc. v. Hewitt*, 598 U.S. 39 (2023), is not to the contrary. *Helix* dealt narrowly with whether workers paid a daily rate (and only a daily rate) met the salary-basis test. 598 U.S. at 50-55. The Court held that a "daily-rate worker does not qualify . . . as a salaried employee" because, naturally, a daily rate is not payment on a "weekly, or less frequent basis." *Id*. at 54. The employer in *Helix*, therefore, could not satisfy the general salary basis rule of § 602(a), but was forced to travel under a "second path—apart from § 602(a)" that expressly allows even "daily, hourly, or shift" workers "to meet the salary-basis requirement" so long as the employer conforms to the reasonable relationship test. *Id*. at 55.

Greinstein cannot twist the Supreme Court's language in *Helix* to extend to the RET-B plan here. Helix's undisputed promise to pay Hewitt *a day rate* exceeding $455 is distinct from an employer's accepted offer to pay employees a weekly salary. A promise to pay employees a day or shift rate that exceeds the threshold for salary payment under 29 C.F.R. § 541.600 is not the same as a promise to pay a weekly salary exceeding that amount. *See Helix*, 598 U.S. at 61 (referring to employees "working on a per-day or per-shift basis," not to those paid a weekly salary). Day- and shift-rate-paid employees, by definition, fall under § 604(b), not § 602(a)/§ 604(a). Those employees, because they are not paid a weekly salary, start from a position of having "entitlement to overtime compensation." *Id.* The opposite is true for Greinstein and his fellow Plaintiffs here because FieldCore paid them a weekly base salary, and then they received additional compensation on top of that if they worked beyond a normal 40-hour workweek.

Because this case, unlike *Helix*, involves employees paid on the basis of a week, not a day, there is no conflict between *Helix* and the numerous cases that have held the reasonable relationship inapplicable to hybrid compensation cases under § 604(a). Indeed, by affirming the Fifth Circuit's *en banc* decision, the Supreme Court reinforced that, properly read, "there is no actual conflict" between *Helix*'s construction of the regulations and that of *Litz v. Saint Consulting Group, Inc.*, 772 F.3d 1 (1st Cir. 2014), and *Anani v. CVS RX Services, Inc.*, 730 F.3d 146 (2nd Cir. 2013). *Hewitt v. Helix Energy Sols. Grp., Inc.*, 15 F.4th 289, 297 (5th Cir. 2021) (*en banc*). As discussed in Section IV.A.1, *supra*, *Anani* forecloses Greinstein's argument. In *Anani*, as here, the employee received a guaranteed weekly base salary, plus an hourly rate for additional hours worked beyond 44/week. *Anani*, 730 F.3d at 147. The court held that this compensation scheme satisfied § 602(a). *Id.* at 168. Under Greinstein's reading of the regulations, the employee's compensation in *Anani* would have been improper because the ratio of his total earnings to guaranteed salary was almost "2 to 1." *Id.* at 169.

Likewise, in *Litz*, the employees "typically worked more than 40 hours per week" and "[f]or most weeks, their earnings equaled the number of hours they billed to clients multiplied by an hourly rate." *Litz*, 772 F.3d at 2. Their weekly guarantee was $1,000, but they could receive three times that amount depending on hours worked. *Id.* The court held that this compensation scheme satisfied § 602(a) even though "the paystubs generated by [the employer's] payroll company . . . show hours times hourly rate, with no express reference to" the weekly guarantee. *Id.* at 5. FieldCore's compensation structure likewise satisfies § 602(a).

To the extent Greinstein relies on two recent decisions, *Gentry v. Hamilton-Ryker IT Sols., L.L.C.*, 102 F.4th 712 (5th Cir. 2024), and *Pickens v. Hamilton-Ryker IT Sols., LLC*, 133 F.4th 575 (6th Cir. 2025), to support his reasonable relationship argument, those cases are inapposite. In *Gentry*, the employees' guaranteed potion was only "equivalent to one eight-hour workday." 102

-40-

F.4th at 724. That eight-hour guarantee was not enough, the Fifth Circuit said, because "[a] straight-forward reading of the text makes clear that § 604(a) does not envision hourly pay for work within the normal workweek." *Gentry*, 102 F.4th at 722 (emphasis in original). In other words, a guarantee that covers only eight hours of work in a week fails on its face to comport with § 604(a)'s requirement that the guarantee covers at least the normal 40-hour workweek. *See Rindfleisch v. Gentiva Health Servs., Inc.*, 962 F. Supp. 2d 1310, 1321 (N.D. Ga. 2013) ("Under subsection (a), 'beyond the normal workweek' signifies hours worked in excess of forty.").

Similarly, in *Pickens*, the employee "was guaranteed pay each week for the equivalent of 8 hours." *Pickens*, 133 F.4th at 578. Because his guarantee was for only eight hours instead of 40, he was "paid based on a fixed hourly rate for hours worked *within the normal workweek*," *i.e.*, for hours nine through 40. *Id.* at 584 (emphasis in original). The Sixth Circuit likened the eight-hour guarantee to the single day guaranteed in *Helix*. *Id.* at 583. In both cases, the guaranteed amount covered only one-fifth of a normal 40-hour workweek. That is why the Sixth Circuit deemed the eight-hour guarantee not a "true" weekly salary and applied the reasonable relationship test of § 604(b). *See id.* ("Pickens, just like the employee in *Helix*, was guaranteed payment for a single day's work."). Put differently, the reasonable relationship test applied to the employees in *Helix*, *Gentry*, and *Pickens* because the employer in those cases paid hourly (or daily, in the case of *Helix*) compensation in lieu of a salary prior to an employee hitting the standard 40-hour mark. *See Chakir v. BA Rsch. Int'l, LP*, 2011 WL 13248862, at *3 (S.D. Tex. 2011) (under § 604(b), "workers are not paid by the hour, shift, or day *in addition* to the [guaranteed weekly] minimum; rather their hourly, shift, or day pay is *substituted* for the minimum") (emphasis in original). Here, Greinstein and the other Plaintiffs' pay was the opposite: they received a full week's pay, mathematically equivalent to 40 hours, if they worked even one hour in a week, and only received additional compensation past 40 hours. Section

604(b), therefore, is not applicable.[17]

## B.  FieldCore Didn't Make Improper Deductions From Greinstein's Salary

Greinstein claims that a singular, isolated pay check for a full 8-hour day establishes that FieldCore misclassified him. On October 21, 2016, FieldCore paid him for 8 hours of work during the week of October 3-9, 2016. (App. 1264 [Paystub].) Greinstein does not remember, actually, anything about this week, other than that he recalls being paid for the 8 hours. (App. 0041-0042 [Greinstein Dep. 125-126].) He *supposes* that he spent the day for which he was paid driving from a worksite or project; but he doesn't know—he guesses maybe it was from a project in Missouri or Texas. (App. 0041-0043 [Greinstein Dep. 125-127].) What he does know is that he did not work on any other day that week; rather he washed or fixed his car, rode motorcycles, played with his grandkids, or did something else of a personal nature. (App. 0044-0048 [Greinstein Dep. 128-132].) It's not inconceivable that he took on work from another employer. (App. 0055-0056 [Greinstein Dep. 153-154].)

Employers may deduct from an exempt employee's pay when the employee is absent from

---

[17] Even if the reasonable relationship test were to apply (to be clear, it does not in this case), and assuming *arguendo* that Greinstein's proffered "1.5-to-1 ratio" is the appropriate benchmark, his compensation would pass that test. Reasonable relationship is generally assessed on an annual basis. *See Brown v. Aleris Specification Alloys, Inc.*, 2016 WL 1183207, at *4 (N.D. Ind. 2016) (analyzing "total annual compensation from overtime"); *Haas v. Behr Dayton Thermal Prod., LLC*, 2008 WL 11351383, at *13 n.15 (S.D. Ohio 2008) (analyzing "base compensation" and "total compensation" on an annual basis).

FieldCore paid Greinstein a total of $30,378.80 in 2016, with $20,073.80 of that coming from his weekly salary. (See App. 0136 [Greinstein's 2016 W-2] and App. 0086 [Paystub for period ending 12/4/2016].) That results in an earnings-to-salary ratio of 1.51-to-1, right at Greinstein's proffered benchmark. In 2017, Greinstein was paid a total of $51,073.70, with $43,918.70 of that coming from his weekly salary, for a ratio of 1.16-to-1. (See App. 0136 [Greinstein's 2017 W-2]; App. 0148 [Greinstein's second 2017 W-2]; App. 0122 [Paystub for period ending 6/4/2017]; App. 0134 [Paystub for period ending 11/19/2017].)

(A note on methodology: Box 1 on Greinstein's 2016 W-2 shows his total earnings for the year. His base salary compensation is calculated by subtracting from that amount the number shown under the year-to-date column for straight-time premium pay on his last paycheck for that year. Greinstein's annual earnings for 2017 is the sum of the Box 1 amount shown on his two W-2 forms for that year. His base salary compensation for that year is calculated by subtracting (from those total W-2 earnings) the year-to-date amounts for premium pay shown on the two paystubs cited.)

work for one or more full days for personal reasons (other than sickness or disability). *See* 29 C.F.R. § 541.602(b)(1) ("Thus, if an employee is absent for two full days to handle personal affairs, the employee's salaried status will not be affected if deductions are made from the salary for two full-day absences."). Given his testimony, it is indisputable that, assuming he worked one full, 8-hour day during the week of October 3, 2016, FieldCore certainly did not owe him pay for the other days of the week, when he was free to do whatever he wanted, including work for another employer.

Nevertheless, under Granite's policy, if Greinstein actually worked on October 3, 2016, he should have been paid his predetermined $1,800 weekly salary (and today, FieldCore's payroll system would automatically ensure such payment). But in this instance, Greinstein incorrectly recorded his time. (App. 0154 ¶ 4 [Johnson Decl.].) At that time, Greinstein was required to record at least 40 hours each week on his timesheets in any week that he worked.[18] (App. 0153-0154 ¶ 3 [Johnson Decl.].) To the extent Greinstein performed only 8 hours of compensable work, he was required to enter the 8 hours of work time, plus 32 hours of unproductive time, so that he would be paid his weekly salary of $1,800. (*Id.*) Because Greinstein failed to do so and did not subsequently report the error so that it could be corrected, he was paid according to how he entered his time for that sole week.

It appears, however, that Greinstein did not actually work at all during that week. According to FieldCore's records, Greinstein erroneously entered time for the week when he should not have. In the preceding week, September 26 to October 2, 2016, Greinstein entered time and claimed per diem for five days: Monday through Friday. (App. 1265-1266 [Timesheet].) He entered no time and claimed no per diem for Saturday or Sunday. (*Id.*) Because per diem payments covered food and

---

[18] FieldCore has since put a mechanism in place to ensure that when a salaried exempt employee (who is paid under Greinstein's compensation plan) records any time, even if less than 40 total hours, he receives his full predetermined salary for that week. (App. 0154 ¶ 6 [Johnson Decl.].)

lodging while Greinstein was traveling (App. 0037-0038 [Greinstein Dep. 106-107]), it is likely that Greinstein actually left the project site no later than Friday, September 30, 2016. Because he cannot recall what actually happened the week of October 3, he cannot dispute the veracity of this alternative explanation for his 8 hours of pay. The isolated pay event should have no bearing on his exempt status.

Even if it did, such a one-off occurrence does not destroy an employee's salary basis pay unless there is proof that it was an "actual practice," as opposed to an isolated or inadvertent deduction. *See* 29 C.F.R. § 541.603(b) ("If the facts demonstrate that the employer has an actual practice of making improper deductions, the exemption is lost during the time period in which the improper deductions were made"); *see also Escribano v. Travis Cty., Texas*, 947 F.3d 265, 274 (5th Cir. 2020) ("Because the detectives 'cannot demonstrate that [their] pay was actually subject to improper deductions,' the County was entitled to judgment as a matter of law on this question.'"); *Jones v. New Orleans Reg'l Physician Hosp. Org., Inc.*, 981 F.3d 428, 433 n.2 (5th Cir. 2020) ("Even if [the employer] did not perfectly comply with the regulations in these instances . . . the examples provided are insufficient to show an *actual practice* of improper deductions. When determining whether an actual practice of improper deductions exists, the relevant regulation regards both the number of improper deductions and the time period in which they were made as relevant considerations.") (emphasis added) (citing 29 CFR § 541.603); *Abramo v. City of New York*, 54 F. App'x 708, 711-12 (2d Cir. 2003) ("When an impermissible deduction 'is inadvertent, or is made for reasons other than lack of work,' an employer may restore an employee's exemption . . . "). Factors to consider in determining whether an employer has an actual practice of making improper deductions:

> the number of improper deductions, particularly as compared to the number of employee infractions warranting discipline; the time period during which the employer made improper deductions; the number and geographic location of

employees whose salary was improperly reduced; the number and geographic location of managers responsible for taking the improper deductions; and whether the employer has a clearly communicated policy permitting or prohibiting improper deductions.

29 C.F.R. §541.603(a)

Notably, Greinstein neither alleges nor presents any evidence of having complained to anyone that he was allegedly improperly paid for this workweek, nor is there any evidence that he did not receive his weekly salary of $1,800 in any other workweek. (Nor do the other Plaintiffs present any evidence of instances where they were paid less than their predetermined weekly salaries.) Rather, Greinstein's pay records confirm he was otherwise paid precisely as described in his offer letter—a predetermined salary for each week worked, plus additional pay for hours worked in excess of 40 in a week.[19]

## VII.  In the Alternative, the FLSA Precludes a Regulation That Requires Overtime Pay for an Employee Working in an Executive, Administrative, or Professional Capacity Based Solely on How Their Pay is Computed

When evaluating regulations, courts must "exercise independent judgment in construing statutes administered by agencies." *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369, 406 (2024). Courts need not enforce even a "permissible" interpretation by an agency if it "is not the one the court, after applying all relevant interpretive tools, concludes is best." Id. at 373. That holds true in the context of the FLSA. *See, e.g.*, *Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 159 (2012) (rejecting DOL's view of regulations regarding the "outside salesman" exemption in part because that view was "flatly inconsistent with the FLSA"); *see also Encino Motorcars*, 584 U.S. at 89-90 (finding that, despite DOL's conclusion that automobile dealership service advisors

---

[19] Even assuming Greinstein could establish an actual practice (and he cannot), the exemption would only be lost in the single October 2016 workweek; it would not serve to preclude Defendants' reliance on the exemption across the entire relevant time period. *See Coates v. Dassault Falcon Jet Corp.*, 961 F.3d 1039, 1048 (8th Cir. 2020) (holding "even if Plaintiffs establish an actual practice, the exemption is lost only 'during the time period in which the improper deductions were made for employees in the same job classification working for the same managers responsible for the actual improper deductions.' 29 C.F.R. § 541.603(b).").

were not exempt, a fair reading of the FLSA's Section 13 exemption governing automobile "salesmen" did not support that conclusion).

The text of the FLSA exempts from its overtime-pay requirement "any employee employed in a bona fide executive, administrative, or professional capacity." 29 U.S.C. § 213(a)(1). The FLSA's "emphasis on the 'capacity' of the employee counsels in favor of a functional, rather than a formal, inquiry, one that views an employee's responsibilities in the context of the particular industry in which the employee works." *Christopher*, 567 U.S. at 161. None of the statutory terms— capacity, executive, administrative, professional—"suggest" that "salary" or compensation is relevant to the exemption. *Nevada v. U.S. Dep't of Labor*, 218 F. Supp. 3d 520, 529 (E.D. Tex. 2016); *see also Texas v. U.S. DOL*, 2024 WL 4806268, at *6 (E.D. Tex. 2024) (noting that DOL recognized from the beginning it "is not authorized to set wages or salaries for executive, administrative and professional employees"). The exemptions rest on an employee's functions and duties, while the statute makes no mention of compensation—whether level of compensation or how it is computed. *See Helix*, 598 U.S. at 67 (Kavanaugh, J., dissenting) (noting that the regulations concerning "how much an employee is paid or how an employee is paid" are inconsistent with the FLSA's statutory language).

The statutory structure of the FLSA confirms that an employee cannot be excluded from the exemption here based on compensation. When Congress wants to make an exemption turn on a feature of compensation, it says so. Indeed, in several other exemptions, Congress specified that the exemption turns on a feature of compensation, for example agriculture employees "paid on a piece rate basis," 29 U.S.C. § 213(a)(6); computer workers paid on an hourly basis of at least $27.63, *id.* § 213(a)(17); local-delivery drivers "compensated . . . on the basis of trip rates," *id.* § 213(b)(11); baseball players provided a minimum weekly salary, *id.* § 213(a)(19). It did not do so here. So a regulation cannot bring an employee within the FLSA's overtime-pay requirement based on how he

is compensated when he is employed in an executive, administrative, or professional capacity.

Even if compensation were not a bright line barrier for exclusion, but rather a factor to be considered in determining whether an employee works in a *bona fide* exempt capacity, the technicality that Greinstein constructs to bar an exemption's application to him would breach the FLSA's guardrails. It would have this Court disregard that FieldCore has paid him a salary—as an exempt employee for the exempt duties he performs—and would disqualify him from exempt status solely because it paid him additional compensation beyond that salary. If compensation is a factor to be considered in determining whether an exemption applies under the FLSA, Greinstein's compensation should do nothing but confirm his status as having worked in a *bona fide* exempt capacity.

## VIII.     Greinstein Cannot Establish Any Violation of the FLSA, Let Alone a "Willful" One

A claim for damages under the FLSA is limited to two years, unless the plaintiff proves a willful violation to extend to a third year. 29 U.S.C. § 255(a). Greinstein bears the burden of establishing that Defendants' conduct was a willful violation of the FLSA. *See Zannikos v. Oil Inspections (U.S.A.), Inc.*, 605 F. App'x. 349, 351 (5th Cir. 2015); *see also Hernandez v. Homesley*, No. 11-cv-1268, 2013 WL 124102, at *3 (N.D. Tex. Jan. 10, 2013) ("Summary judgment on the issue of willfulness is appropriate if Plaintiff fails to introduce evidence sufficient to raise a genuine dispute of material fact regarding willfulness.").

The standard of willfulness "is a lofty one, because the Supreme Court has instructed that the plaintiff must prove 'that the employer either knew or showed reckless disregard for the matter of whether its conduct was prohibited by statute.'" *Huggins v. U.S.*, 2005 WL 6112625, at *9 (Fed. Cl. 2005) (quoting *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 133 (1988)). Even negligence, or lacking a reasonable basis for a classification decision, is not enough. *McLaughlin*, 486 U.S. at 133. (rejecting a standard that would find a willful violation when "an employer knew that the FLSA

was 'in the picture,'" because that would grant the two-year limitations period only to "ignorant employers"; "negligence [or] a completely good-faith but incorrect assumption that a pay plan complied with the FLSA" is not willfulness); *see also Schreckenbach v. Tenaris Coiled Tubes, LLC*, No. 11-CV-4065, 2013 WL 178126. At *11 (S.D. Tex. Jan 16, 2013) ("The willfulness standard is a formidable one because the FLSA's two-tiered statute of limitations 'makes it obvious that Congress intended to draw a significant distinction between ordinary violations and willful violations.'") (quoting *McLaughlin*, 486 U.S. at 132); *Sonnier v. Recon Mgmt. Servs. Inc.*, No. 20-CV-02, 2022 WL 141779, at *10 (W.D. La. Jan. 14, 2022) (noting that even "[a]n unreasonable violation is not a willful violation").

Greinstein cannot prove that Defendants acted willfully to violate the FLSA. FieldCore has long had a policy of paying employees like Greinstein their full weekly salary for any week in which they perform work, and FieldCore has systematic, software programming in place to ensure that RET-B employees are paid accordingly. FieldCore (and Granite before it) also have robust compliant and reporting processes in place for any employee who believes he has not been properly paid.

Finally, even if this Court were to accept Greinstein's theory that the reasonable relationship test applies to employees who are paid a weekly salary and satisfy the requirements of the HCE exemption—the same theory it already considered and rejected in both *Trottier* and this case previously—and that he was not exempt under the FLSA under that theory, such violation could not have been willful. The DOL Opinion Letter on which Greinstein relies was not issued until November 8, 2018, *after* this case was filed on November 2, 2018. Moreover, the precise contours of the reasonable relationship test (where it applies) have been a source of unsettled law throughout the pendency of this litigation, as evidenced by the divided Supreme Court in *Helix*. Defendants cannot have willfully violated a regulation they had no reason to believe even applied.

Accordingly, as a matter of law, Greinstein cannot establish willfulness, and his claims are governed by a two-year statute of limitations.

## CONCLUSION

When this Court certified its prior summary judgment opinion for interlocutory appeal, it noted that 29 C.F.R. § 604(a) presented "one final gate" that "Defendants must pass through" to succeed on their motion for summary judgment. *Greinstein*, 2023 WL 5167606, at *3. With the Fifth Circuit's decision eliminating § 604(a) as an obstacle, this case is now ripe for summary judgment. Therefore, on the basis of the foregoing undisputed facts, authorities, and arguments, Defendants respectfully request that the Court grant their Renewed Motion for Summary Judgment pursuant to Fed. R. Civ. P. 56(c) and dismiss with prejudice the claims of all Plaintiffs herein.

Date: May 14, 2025

Kelly D. Utsinger
Texas Bar No. 20416500
kelly.utsinger@uwlaw.com
UNDERWOOD LAW FIRM, P.C.
500 S. Taylor, Suite 1200 LB 233
Amarillo, Texas 79101
Tel: (806) 376-5613
Fax: (806) 379-0316

Respectfully submitted,

/s/ *Brett C. Bartlett*
 Brett C. Bartlett*
 Georgia Bar No. 040510
 bbartlett@seyfarth.com
 Kevin M. Young*
 Georgia Bar No. 183770
 kyoung@seyfarth.com
 Zheyao Li
 Texas Bar No. 24096419
 yaoli@seyfarth.com
 SEYFARTH SHAW LLP
 1075 Peachtree Street, N.E., Suite 2500
 Atlanta, Georgia 30309-3958
 Telephone: (404) 885-1500
 Facsimile: (404) 892-7056

 *Admitted pro hac vice*

 *Counsel for Defendants Granite Services*
 *International, Inc. and FieldCore Service*
 *Solutions, LLC*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
**AMARILLO DIVISION**

HERMAN GREINSTEIN, Individually and
For Others Similarly Situated,

        Plaintiff,

    v.

GRANITE SERVICES INTERNATIONAL,
INC. and FIELDCORE SERVICES
SOLUTIONS, LLC,

        Defendants.

Case No. 2:18-cv-00208-Z-BR

**CERTIFICATE OF SERVICE**

I certify that on May 14, 2025, I filed the foregoing **MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' RENEWED MOTION FOR SUMMARY JUDGMENT** with the Clerk of the Court using the ECF system, which will send notification of such filing to the following attorneys of record:

Michael A. Josephson
mjosephson@mybackwages.com
Andrew Dunlap
adunlap@mybackwages.com
Richard M. Schreiber
rschreiber@mybackwages.com
JOSEPHSON DUNLAP, LLP
11 Greenway Plaza, Suite 3050
Houston, Texas 77046

Richard J. (Rex) Burch
rburch@brucknerburch.com
BRUCKNER BURCH, PLLC
8 Greenway Plaza, Suite 1500
Houston, Texas 77046

/s/ *Brett C. Bartlett*
One of Counsel for Defendants